**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 3:22-cr-08092-DGC |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 15, 2022 |
| Samuel Rappylee Bateman, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE CAMILLE D. BIBLES, MAGISTRATE JUDGE**

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**ARRAIGNMENT/DETENTION HEARING**</u>

**APPEARANCES:**
For the Plaintiff:
    U.S. ATTORNEY'S OFFICE
    By:  **Mr. Patrick J. Schneider, Esq.**
    2 Renaissance Square
    40 N Central Ave., Ste. 1800
    Phoenix, AZ 85004

For the Defendant:
    ZICKERMAN LAW OFFICE, PLLC
    By:  **Mr. Adam K. Zickerman, Esq.**
    20 E Cherry Ave.
    Flagstaff, AZ 86001

Transcriptionist:
Christine M. Coaly
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

**P R O C E E D I N G S**

COURTROOM CLERK:  This is case number CR-2022-8092, United States of America versus Samuel Rappylee Bateman. Defendant is present and in custody.

This is the time set for an arraignment and a detention hearing.

Counsel.

MR. SCHNEIDER:  Good morning, Your Honor.  Patrick Schneider appearing on behalf of Dimitra Sampson for the United States.

THE COURT:  Good morning, Mr. Schneider.

MR. ZICKERMAN:  Good morning, Judge.  Adam Zickerman on behalf of Mr. Bateman, who appears in custody, seated to my left.

THE COURT:  And good morning, Mr. Zickerman.

And good morning, Mr. Bateman.

THE DEFENDANT:  Good morning.

THE COURT:  Mr. Zickerman, we did receive your notice of appearance.  I appreciate that.

In any event, the next issue that we're going to take up, Mr. Bateman, is the formal arraignment on the indictment.

Mr. Zickerman, have you had an opportunity to review the indictment with Mr. Bateman?

MR. ZICKERMAN:  I did last night, Judge, at the jail. I went over each and every count.  I actually read it to him

verbatim.

With regards to that, his name is set forth correctly. We'll waive a formal reading. We'll enter pleas of not guilty and ask the matter to be set in the course of --

THE COURT: Thank you, Mr. Zickerman.

I will enter pleas of not guilty on the defendant's behalf to the three counts of the indictment.

I can advise counsel that the motion deadline is set for August -- excuse me, October 6th of 2022. And the jury trial is set in this case for Tuesday, November 8th, at 9:00 a.m., before District Judge Campbell, in Phoenix, Courtroom 603.

Now, the next matter that we'll take up is the detention hearing.

I did receive a copy of the Pretrial Services report this morning. I do appreciate Pretrial being able to prepare the full Pretrial Services report in such short period of time.

Mr. Zickerman, have you had an opportunity to review the Pretrial Services report and to review it with your client?

MR. ZICKERMAN: Judge, I have. I received it this morning. I did review it this morning myself. I went over it briefly with Mr. Bateman this morning prior to court.

THE COURT: Would you like some additional time while we're here in the courtroom, or do you feel like you're ready to proceed?

MR. ZICKERMAN:  I feel I'm ready to proceed, Judge. Thank you.

THE COURT:  Thank you.

And, Mr. Schneider, has the United States received a copy of the report?

MR. SCHNEIDER:  We have, Your Honor.  Thank you.

THE COURT:  Thank you.

So, Mr. Bateman, we're going to start the detention hearing next.  And you need to be aware that my actions are guided by several legal principles.  The one that you should keep in mind is that you are presumed innocent.  Nothing that's said during the course of this hearing, even by me, changes that presumption of innocence.

If the United States wants you held in custody, they have the burden of establishing that you're a flight risk, essentially, that you wouldn't be able to follow my orders and appear at future proceedings, and/or, two, that you pose a danger to the community or to any specific individuals in the community.

Because the United States has that legal burden, they're allowed to proceed first with any argument or proffer of facts, then your attorney is allowed to proceed with any argument or proffer of facts, and then, because they have the legal burden, the United States is allowed to present a brief rebuttal.  And that's how we're going to go forward.

Mr. Schneider.

MR. SCHNEIDER:  Thank you, Your Honor.  We'd ask the Court to detain the defendant.  We believe that he poses a flight risk.  We concur with the recommendation of Pretrial Services.

I would point out to the Court that while the defendant is currently charged with destruction of records, and, essentially, obstruction of a criminal investigation, the FBI in this particular matter has been involved in an investigation of the defendant for transporting minors in interstate commerce with the intent to engage in criminal sexual activity.  So that's a further investigation for which charges have not yet been filed, but the nature of what is being looked at.  And I think that's relevant for purposes of the Court to understand why it's so important as to his attempt to destroy evidence in this case.

On August 28th of 2022, the defendant was arrested by Arizona DPS after he was stopped for speeding near Flagstaff, pulling a trailer that was attached to his vehicle where he had numerous unrestrained minors located inside that particular trailer.

He was cited for the exact same thing two weeks prior in Colorado City.  And the state has indicted Mr. Bateman on felony child endangerment charges.

Bail was set at $150,000 cash bond, which he was able

to raise immediately and get bond out -- bonded out.  I point that out, Your Honor, because the defendant, according to Pretrial Services, has very little money, but is able to come up with $150,000 on very short notice.

On the -- the -- relative to the destruction of the underlying evidence, on the night of his arrest, Mr. Bateman, while he was in custody, made calls from the jail, which are recorded, in which he told his followers to delete his Signal account and to delete the whole thing, every message.  Signal is a method that the defendant uses to communicate with his followers, to include his wives, both young and older.  He uses group texts to share the confessions and testimonies of his followers.

The agent has indicated to me that -- and I think the Pretrial Services report bears this out -- that the defendant now is a pilot and has the ability to access small airplanes, so he can certainly flee easily.  As Pretrial Services has noted, he does have a passport, and, according to their investigation, has demanded that all the women and girls get passports for themselves as well.

He has -- travels internationally.  I think that's reflected in the Pretrial Services report, according to the investigation.  He travels internationally for these Mastermind conferences.  He has numerous contacts in Alberta, Canada, where he's traveled and stayed in the past.  He also has

numerous FLDS contacts throughout the country.  Clearly, he has access to funding, as evidenced by the 150,000 that was raised to bail him out.

According to -- according to their investigation, they purchased two Bentleys and two Range Rovers for the defendant, these other individuals that have provided him with the funding for the bail money.  He lives with all of the -- the victims that are being investigated for the underlying interstate transportation.

It's my understanding that CPS has now removed those children from the home as of today.  But that would be the -- that was the proposed location for the defendant to live if he were to be released.

He does have these pending cases in Mohave County and Coconino County.  He has postponed his Mohave County court date already.  And it appears that he, at least according to the information, that he does not wish to attend those court hearings if he can avoid those.  I think the nature of the fact that he was already pending charges and in custody at the time when he was making these phone calls, even knowing they were recorded, to tell people to destroy evidence, is suggestive of the defendant's flight risk, and we would request that the Court detain him as such.

THE COURT:  Thank you.

Mr. Schneider, I have two questions.  First, the

charges relating to the August 28th event appear to have been out of the sheriff's department in the county, or at least they're recorded that way, and you've described it, unrestrained, I believe you've indicated, girls or young women were in the trailer.  Can you -- do you have any information about what the trailer was like?

MR. SCHNEIDER:  I do not, Your Honor.  I don't know the size of it.  But I think that's the -- I think from that -- from -- once the charges were derived that the endangerment for pulling the children in a trailer that's attached behind that are unrestrained, I think there is some belief that that also relates to the other underlying investigation.  The children involved in that are likely some of the witnesses or potential victims in the other investigation.

THE COURT:  And in terms of the age of the girls or the young women, what ages are we talking about?

MR. SCHNEIDER:  Your Honor, I'm informed that some are under the age of 15.

THE COURT:  All right.  Thank you.  Thank you, Mr. Schneider.

Mr. Zickerman.

MR. ZICKERMAN:  Judge, do you prefer me at table or podium?

THE COURT:  Either one.

MR. ZICKERMAN:  Judge, a couple of things here.  First

and foremost, the charges that are before the Court are the ones in the indictment.  I would ask the Court to separate the argument that the government is making with regards to any other pending cases or facts that support the Coconino County matter or Mohave County matter.

I can tell the Court, contrary to the government's argument, that he's not delaying anything.  I represent him on both of those.  I've filed a continuance so that -- and a waiver so that we're taking care of these.  He's not fleeing from these.  He's not trying to avoid these.  He's taken the appropriate steps and asserted his constitutional right for counsel.  So I don't think that argument falls well.

With regards to the Court's comment -- or question to the government about the type of trailer, without breaching any other type of matters, it's an enclosed trailer, right.  It's not a -- it's not a wood trailer that one could think of.  I refer to a wood trailer as it's the open flatbed where you can throw a bunch of, you know, timber and wood and stuff.  It's enclosed.  So it's not as egregious as one would like.

With regards to this particular case, in looking at the facts of this particular case, as -- as we've heard so far, we believe that he is not a flight risk.  And here's why, Judge.

First off, the government's correct, he did post $150,000 bond.  That's a lot of money.  He had a lot of

different people come together and each put in money to do this.  That is not uncommon when you have a really high bond where you have other people collaboratively work together to get the bond.  So I understand where the government's coming from when he said, well, he posted this bond, he at least has this kind of financial resources.  That's not necessarily true because it's a collaborative event.

I also submit that by posting that $150,000 bond, that's actually an assurance to this court, and to the other court, that he's going to be attending all court proceedings.  We've already filed our -- in the state court, the waiver of appearance for his arraignment, and have the matter reset for the case management conference to be a flow of cases.  So that shows that he's taking things seriously.  He's come in, he's already signed, notarized, et cetera, that particular document.

Other things that I think the Court should know that he's not a flight risk.  He is, as noted in the presentence -- excuse me, Pretrial Services report, that he is welcome back at Ms. -- it's Bistline -- at 185 Garden Avenue; welcome to have a place there; welcome to have a third-party there.  There is assurances that he's there.

I've actually spoken with one of the other individuals, Mr. Johnson, who assured me that he can make sure that, for travel arrangements, he can go back and forth from the location up there, to Phoenix, to Coconino Superior Court,

so he would be attending all the proceedings.

Granted, now, the argument with regards to international travel, having a passport, the last I looked, is not a crime. The ability to travel, I think, is an inherent right. A person who goes to Cancun for a business trip shouldn't be punished in looking at, well, hey, he's gone out of country before, and he's gone to Canada, he's gone to Cancun, so he's obviously able to travel and has a connotation of a flight, or a flight risk. That's not -- that is, I think, an improper inference.

It would be saying that anytime you've traveled out of country, whether it's to the Netherlands, or Mexico, or even anywhere, you are implicitly saying that I am a flight risk. I don't think that's the correct analysis under it. I would ask the Court to give that very little weight. The possession of passports, or him having a passport -- I have a passport. I'm fairly confident Mr. Schneider probably has a passport. Having a passport, in and of itself, I don't think is a reason to justify flight.

And if the Court wants an assurance of that, he can surrender it, go from there. We have a guy right now, in dealing with flight, who has no prior felony convictions. He has a handful of charges that are all stemming relatively close in time. He's assured the Court, at least in Coconino, that he's showing up by posting a bond. You know, he has people who

are willing to support him and make sure that he shows up to all court proceedings, so I don't think that bodes well for the government with regards to him saying that he's a flight risk, you know.

I just want to make sure I --

THE COURT:  No, go ahead.

MR. ZICKERMAN:  The other part that is kind of littered throughout the Pretrial Services report is the connotation, and the government touches on it, about his living accommodations and his relationship status.

We do have a right to -- to marry.  We do have a right to have relationships.  I don't think a religious -- I don't think this should be a persecution over a religious view, if you have people who are there, adults who are, you know, adults under the age.  Notation with regards to, on page -- I just had it -- on page 2 of 5 of the presentence -- or Pretrial Services report, talks that he's had relationships with, you know, a handful of individuals, Moretta, Alice, Lia, Morrana, and Shandra.  And speak -- that's on -- it was on page 2 of 5 of -- of the report, Judge, the first real paragraph but the second one on the list.  And they're all adults.  I don't think having that put in there with regards to his relationship status with people is appropriate in taking any type of negative connotation from it.

Matter of fact, I would assert that if he has these

individuals in his life, you will have more people who will assure this Court and the other courts that he will be present at all court proceedings.  I don't think the government has made the showing at this point that he's a true flight risk. Their argument that his willingness to, allegedly, make calls from the jail to do certain things, and I have not -- I say allegedly, Judge, because I have not seen these calls.  I have no personal knowledge of these calls.  But, with regards to it, these particular calls, the government is saying, well -- what they're trying to do is make the leap saying that, because he's done these type of actions, he's now a flight risk.

I don't see that as a flight risk, Judge.  I think it's a poor decision, but I don't see it as a flight risk. He's not telling people to, you know, get out of town.  He's not saying, pack up my bags for me.  As soon as I get out of here, I'm gone.  I think the government makes a reach for it. I think it's an overreach.  And that's my opinion of -- of -- of the factual underpinnings at this point in time.

I also would ask the Court not to take into consideration the underlying or the investigative portion of the FBI right now that has not been charged.  I don't think those facts are relevant in this particular case for these charges itself.

So, with all that, Judge, I would ask the Court not to find the -- he's not a danger.  I don't believe the government

has argued danger.  But I don't believe he's a flight risk at this point in time.

Thank you.

THE COURT:  Thank you, Mr. Zickerman.

I do have a question.  What is a Mindset Consultant, which is where your client is -- describes in the Pretrial Services report as his profession.

MR. ZICKERMAN:  Judge, my understanding -- and if I can have a moment, I'll verify.

THE COURT:  Please go ahead.

MR. ZICKERMAN:  My understanding of it is he tries to bring the good for people.

THE COURT:  I'm sorry, he's doing what?

MR. ZICKERMAN:  He brings the good for people.  He brings -- not goods as in products, but he tries to bring the good out of people and help them rise up, consulting in that way.

But I will -- if the Court will allow me?

THE COURT:  Please, go ahead.

(Off-the-record discussion.)

MR. ZICKERMAN:  I was pretty close, Judge.  It's improving people's way of life with positive thinking and bringing positive mindsets, bringing them positive energy, positive joy.  Looking at situations and saying, well, you could look at it as a -- as a negative, but find the positive

out of this and keep rising above.  It's always the onward, upward view.

THE COURT:  All right.  Thank you.  I appreciate that.

Mr. Schneider.

MR. SCHNEIDER:  Thank you, Your Honor.

Your Honor, the question here is whether the defendant poses a flight risk, and that includes two different things. One, is he likely to -- to attempt to flee if he were released. And number two is flight also includes whether he's likely to follow the Court's orders if the Court were to release him, and whether he would appear at future court appearances.

One thing we know for certain, at least based on the nature of the investigation, and based on the recorded conversations, is that while he was within the jail, he was already violating the court's orders, at least another court's orders, in attempting to destroy evidence, so that's indicative of -- of flight risk.

But what we have here is -- he's not being indicted for having a passport.  What we're looking at is whether an individual has an ability to flee.  And, to that extent, if a person has a passport, if a person has contacts in various countries, if a person has various associates located around the country, if a defendant who describes himself as a survivalist that's a pilot has the ability to flee, if an individual can raise $150,000 in a matter of hours to bail

himself out of custody, all those are indicative of issues that suggest that this is an individual that has an ability to flee. And, under the circumstances, given the fact that he's committing crimes while he's in custody, is suggestive of the fact that he's likely to commit more crimes if released.

And so we think that the defendant does pose a flight risk and would ask the Court to -- to detain him.

Thank you.

THE COURT:  Thank you, Mr. Schneider.

In making my decision today, I'm guided by the law to look at a number of specific factors, and I'll try to break them down.

First are the nature and circumstances of the alleged offenses.  The alleged offenses are concerning.  They allege the destruction of evidence in a federal criminal case.  And, to be very clear, that's what's at issue here.  You're charged with three counts, all of which are very serious.  They carry a maximum sentence of 20 years in prison, each one of them, so they're very serious offenses, in terms of trying to destroy or get rid of evidence, to put it in simple terms.  The -- that is where the nature of the underlying investigation is important for the Court to consider.

First, the defendant has been indicted.  There has been a probable cause determination by a grand jury that he has engaged in obstruction of evidence.  And what the United States

is setting out as the underlying offense that's being investigated is also a very serious offense, and that involves transporting young girls, essentially, across state lines, for sexual purposes.  That's an extremely serious crime.  And because of that interconnection between the two offenses, the ones that are indicted and the ones that were being investigated at the time that the current indictment was alleged, I can consider the nature and circumstances of the full investigation.  It would not make sense for me to put blinders on and try to focus solely on an indictment like this if I wasn't looking at what the underlying case was about.

I will say the nature of the indictment, though, is very concerning.  It suggests an attempt to get rid of evidence in a federal case.  And that's something that a federal judge is going to consider in trying to determine whether an individual would be able to follow a federal court order, and what they're to do and how they're to act, and whether they would show up down the road.

So the United States is quite right.  The flight component is broken down, both not only likelihood of flight, but also whether a federal court order would be obeyed.  And, in doing that, I certainly look closely at the nature of the underlying indictment.

The second factor that I look at, although the Ninth Circuit has told us to give the least consideration to this

factor, would be the weight of the evidence.  And, in this case, that's a little difficult for me to assess anyway.  As your attorney has suggested, we don't have the evidence in front of us.  What we have is an indictment alleging that while in custody on a state crime that a jail phone was used to attempt to destroy evidence.  And -- and that involves, by its nature, something that I think both sides have alluded to, and that is -- and I can't remember who used the phrase followers -- but it is of concern to this Court when I evaluate this that there are people who, apparently, the defendant trusts to be able to follow through with an order or direction to get rid of evidence in a federal case.

And, also, that is where I think the United States' perspective about the defendant having people who are willing to do what he says, to the tune of coming up with a considerable amount of cash to make bond to get him out of custody.  In any event, the weight of the evidence is something that I will give some consideration to but not a lot of consideration, but it does sort of dovetail with the nature and circumstances of the alleged offense as well.

The third factor that I look to are the history and characteristics of the defendant.  And that includes physical and mental condition, family ties, employment, length of residence in the community, past conduct, criminal history, history of any drug or alcohol abuse, record of appearances,

whether on release. And, in this case, the defendant appears to be in good physical and mental condition. He clearly has strong ties to the community. And that is a factor that does, I will say, cut both ways. One, the defendant does appear to have a substantial community that he relies on, but it is also clear, based on what's been proffered today, that there are people who will, apparently, follow the defendant even if that means committing a federal offense. And that is of concern to the Court in looking at the nature of the defendant's connections and his characteristics.

I am concerned as well not -- although he does not have any felony convictions, and given his age that's something he's -- gets credit for, in terms of the Court's assessment. But I am concerned about the nature of the pending state charges, and I am concerned about the fact that young -- unrestrained young girls, which are defined as under 15 years old, were in some sort of enclosed trailer following a vehicle that was speeding on the roads in Arizona. And I -- that is something that is a little, frankly, perplexing, given the resources available, apparently, to the defendant, that there were young girls in a vehicle that's enclosed. And I, frankly, don't know how to make sense of that.

This does -- and it does appear that there is at least two incidents of this in fairly close proximity. And I'm, frankly, just not sure what to make of that, but it does cause

concern, particularly, if these same -- I'm going to refer to them as children -- if these same children are also the same ones who are the subject of the federal investigation involving their transportation across state lines for illegal purposes. And I do have grave concerns about that.

And I have concerns, as well, about the nature of the life the defendant lives. I did note in the Pretrial Services report the referral to the fact that the defendant portrays himself as a survivalist. He is a pilot. He is able, obviously, to use a plane to transport himself.

I am concerned, as well, when I look at the fourth factor, which is the nature and seriousness of the danger to others in the community, not just the circumstances of the pending charges, which are just pending charges, they're certainly not finalized, but I do also -- am not sure quite what to make about the young girls and women being told to obtain passports, particularly, in light of what appears to be a fairly recent passport from the defendant.

And I will point out, defense counsel is quite right, and, that is, it is not illegal to have a passport, but in making a determination about the danger to others, and in whether or not the defendant is a flight risk, part of what I can consider is is this a person who has the resources and ability to flee the country and try to flee federal charges. And that is of concern to this court.

Many people who are before this court are not -- I have no concerns that they're going to flee the country, but in this case I do have concerns about that, and particularly in light of what was proffered about, potentially, the alleged victims in a federal investigation being told fairly recently to obtain passports, or for passports to be obtained for them. That, and given the nature of the indictment, I do have increased concerns about what that may mean and what the ultimate outcome of that could be.

I do find that, based on the nature of the investigation, which gets at the very heart of the rule of law in federal court, and that is the destruction of evidence, I -- I do have tremendous concerns about that. And given the nature of the investigation that was being obstructed, I have concerns about a group of individuals, and that would be young girls, who are vulnerable and who may be -- may lack protection. It appears that at least some of these young girls are in CPS -- or what we used to refer to as CPS -- Department of Child Services custody now, but I do have concerns about any efforts that might be made with respect to them, and about the general nature of the danger presented to others.

And I acknowledge what defense counsel has alluded to, and that is lifestyle choices and religion, certainly something that we don't question, but I will point out as well, the courts and society have a tremendous interest in protecting

those who can't protect themselves, and that would be young girls, what's been defined as under the age of 15. We have a heightened responsibility to protect that group of individuals.

And so I do find, as I review the evidence, I concur with Pretrial Services. I have reviewed the evidence. I do note that Pretrial Services has recommended that the defendant be detained.

I will say that based on the unstable -- and I think that's a good description in the Pretrial Services report -- unstable living situation, the nature of the alleged offenses, the availability of international travel, the availability, apparently, to have followers provide funding and tools to get -- provide resources, I do have concerns about the defendant's, both his lack of ability, potentially, to follow a federal court order, as well as his, just pure flight risk, or his likelihood to flee to avoid charges that could potentially put him in prison for the rest of his life.

I do have concerns about the pending charges. Although, I agree with Mr. Zickerman, that it appears he has responded to those pending charges, but the underlying nature of them, in light of what's being investigated here, also creates additional concerns for this Court.

I do find, based on my review of the evidence as well, and those same factors, that the defendant poses a danger to the community.

I have considered whether there are any conditions that I could impose, and given the entire circumstances that have been described for the Court, I find that there aren't any conditions that I can impose that would assure that he would follow my orders and that he would not flee.

And I also find that there are no conditions that I can impose, particularly, given that the nature of the offense that's alleged here occurred while he was in custody, I find that there really are no conditions that would assure for the safety of the community in this case.

So, Mr. Bateman, you are going to be detained pending trial in this matter.  So what will happen at this point is, as you heard, I announced the trial date, which is in the Phoenix courthouse.  Your next hearings in this case will all be in the Phoenix courthouse.  So at some point in the fairly near future you will be transported to a facility that's closer to the Phoenix courthouse.

Mr. Zickerman.

MR. ZICKERMAN:  Judge, I was going to address that with the Court, if this is the appropriate time?

THE COURT:  Go ahead.  No, this is the appropriate time.

MR. ZICKERMAN:  Judge, with regards to the request -- or the Court's order about transporting him down to an area closer to the Phoenix courthouse, I understand that he will

have hearings there. I also understand that he has hearings in Flagstaff.

I don't know if it's permissible to have him housed here for a bit of time so that we can continue to try to handle all of the other matters, but I would ask that of the Court. Rather than transporting him down to Phoenix, at least allowing him to remain in the Coconino County Jail, at least until we figure out what's going to happen with the Coconino County and Mohave County matters. There is -- you have three competing jurisdictions at this point.

THE COURT: No, and I appreciate the question. Although, whether the defendant is here or in one of the facilities outside the Phoenix area, he would have to be writted out into state custody in order to appear on those cases either way. So his sheer presence here wouldn't necessarily make that easier. That would be an unusual order to ask that he be held here, given that his next hearings would be in Phoenix.

I will inquire of the United States. Any additional considerations that's -- it is an unusual order, or request for an order.

MR. SCHNEIDER: It is. It is, Your Honor. I -- I -- I have not spoken to Ms. Sampson about what interactions she's had with the state authorities. It would be my assumption, based upon prior experience, that given the fact that he's now

in federal custody, they would defer until those federal charges are resolved, or they would attempt to -- to writ someone out. Because, as the Court knows, it creates speedy trial issues in both locations if, in fact, the defendant is transferred back and forth.

So my assumption would be that now that federal charges have been filed and the defendant is in federal custody, that they would hold in abeyance those state matters, I would think, until such time as the federal charges have been completed.

THE COURT:  Thank you, Mr. Schneider.

Mr. Zickerman.

MR. ZICKERMAN:  Judge, the other reason, not only for, I guess, dealing with jurisdictions, and I understand the Court, and I recall about the writs to get him out, but also for, I guess in some ways, ease of communication between myself and Mr. Bateman, it's -- the accessibility for the Coconino County Jail, either in person or the Telmate, their electronic use that they have in there, would make it a whole lot easier for me to be able to have regular communications with him.

I understand that, by taking on a federal case, there is the risk of bringing him down there, but I -- it is an unusual request. I know it's an unusual request. But based off of this kind of unique set of circumstances, that's why I bring these questions forward.

THE COURT:  All right.  No, and I appreciate that.

At this time, I wouldn't be inclined to enter a special order directing the marshals to maintain him here. Really the issue of custody is handled by the U.S. Marshals between now and trial, and I would be hesitant to intervene in that process at this point.

If I reconsider that, I would, obviously, issue an order, and I will give it some additional consideration, but, at this time, I'm not inclined to go ahead and issue an order in that vein.

MR. ZICKERMAN:  All right.  Thank you, Judge.

THE COURT:  Is there anything further on behalf of the United States, Mr. Schneider?

MR. SCHNEIDER:  No, Your Honor.  Thank you.

THE COURT:  Mr. Zickerman, is there anything further on behalf of Mr. Bateman?

MR. ZICKERMAN:  No, Judge.  Thank you.

THE COURT:  Good luck to you, sir.

(The proceedings were adjourned.)

*        *        *

C E R T I F I C A T E


        I, CHRISTINE M. COALY, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


        DATED at Phoenix, Arizona, this 10th day of April, 2023.


                                /s/ Christine M. Coaly_____
                                Christine M. Coaly, RMR, CRR


UNITED STATES DISTRICT COURT