FILED ___  LODGED X
RECEIVED ___  COPY T

APR 0 1 2024

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

FILED ✓  LODGED ___
RECEIVED ___  COPY ___

DEC 0 9 2024

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

GARY M. RESTAINO
United States Attorney
District of Arizona

DIMITRA H. SAMPSON
Arizona State Bar No. 019133
Email: dimitra.sampson@usdoj.gov
JILLIAN BESANCON
California State Bar No. 285869
Email: jillian.besancon@usdoj.gov
RYAN POWELL
Arizona State Bar No. 025695
Email: ryan.powell@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>        vs.<br><br>Samuel Rappylee Bateman,<br><br>                    Defendant. | CR-22-08092-001-PCT-SMB<br><br>**PLEA AGREEMENT** |

Plaintiff, the United States of America, and the defendant, SAMUEL RAPPYLEE BATEMAN, hereby agree to resolve this matter on the following terms and conditions:

1.    **PLEA**

The defendant will plead guilty to Count 2 of the Third Superseding Indictment, Conspiracy to Commit Transportation of a Minor for Criminal Sexual Activity, in violation of Title 18, United States Code (U.S.C.), Section 2423(a) and (e); and Count 53 of the Third Superseding Indictment, Conspiracy to Commit Kidnapping, in violation of Title 18, United States Code (U.S.C.), Section 1201(c), both Class A felony offenses.

2.    **MAXIMUM PENALTIES**

a.    A violation of 18 U.S.C. § 2423(a) and (e) is punishable by a maximum fine of $250,000, a term of imprisonment of ten years to life, or both a fine and term of imprisonment, and a term of supervised release of five years to life. A violation of 18 U.S.C. § 1201(c) is punishable by a maximum fine of $250,000, a term of imprisonment of up to life, or both a fine and term of imprisonment, and a term of supervised release of five years.

b.    According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

(1)    make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663 and/or 3663A, unless the Court determines that restitution would not be appropriate;

(2)    pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

(3)    serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases);

(4)    pay upon conviction a $100 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013; and

(5)    pay upon conviction an additional $5,000 special assessment pursuant to 18 U.S.C. § 3014(a), unless the Court determines that the defendant is indigent.

c.    The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence. However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime(s) of conviction, unless there are stipulations to the contrary that the Court accepts.

3.    **AGREEMENTS REGARDING SENTENCING**

a.    Sentencing Agreements. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United

States and the defendant stipulate that the defendant's sentence shall be no less than 20 years and no greater than 50 years' imprisonment, followed by lifetime supervised release.

b.    Agreement Contingent on Plea by Co-Defendants. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate that this plea is contingent on a guilty plea being entered by each of the co-defendants named in the Third Superseding Indictment and accepted by the Court. The defendant understands that if any of his co-defendants fail to accept their plea agreements for any reason or do not enter guilty pleas, the United States may, but is not required to, withdraw from the plea agreement, in which case the parties would not be bound by any of the terms of this plea agreement, including the recommendations, stipulations, and other agreements herein, or any of the facts contained in the factual basis. If any of his co-defendants withdraw their guilty pleas, or if the Court rejects any of his co-defendants' pleas, the United States may, but is not required to, withdraw from this plea agreement with the defendant. Only the United States (not the defendant) may elect to withdraw from the plea agreement.

c.    Stipulation: Sex Offender Conditions. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant stipulate, and the defendant agrees, to the following sex offender conditions during the term of supervised release: within three days from release from prison, the defendant shall register as a sex offender in accordance with tribal, state, and federal law in any jurisdiction in which he resides, is employed, or is a student, and will provide the supervising probation officer with verification of registration. During the term of supervised release, the defendant shall undergo sex offender treatment and counseling as directed by the probation department and as ordered by the Court. Such treatment may include physiological testing, including clinical polygraph testing. If the probation department, and the Court, in determining the most appropriate sentence, deems it appropriate, the defendant shall submit to a presentence sex offender evaluation pursuant to 18 U.S.C. § 3552(b). Such sex offender evaluation shall be conducted under the standardized conditions set forth by the examiner. The defendant's attorney shall not be present during any part of the examination unless otherwise authorized by the examiner in

- 3 -

advance of said evaluation or as otherwise agreed upon between the parties in writing. The parties agree that any statements used in connection with the examination shall not be used in the instant prosecution or in any subsequent federal prosecution of the defendant in the District of Arizona. As a condition of supervised release, the defendant shall cooperate in the collection of a DNA sample as authorized in 18 U.S.C. § 3583(d).

d. Restitution. Pursuant to 18 U.S.C. § 3663, 3663A and/or 2248, the defendant specifically agrees to pay full restitution to all victims in an amount to be determined by the court, but in no event, more than $1,000,000.00 per victim. "Victims" include persons or entities directly or proximately harmed by defendant's "relevant conduct" including conduct pertaining to any dismissed counts or uncharged conduct, as defined by U.S.S.G. §1B1.3, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663, 3663(A) or 2248. Pursuant to 18 U.S.C. §§ 3663 and 3664(j)(1), "victims" also include persons or entities (whether private or government: state, federal or tribal) that have paid or costs related to defendant's conduct, including insurance providers and health care providers (including those such as Medicaid, Medicare and AHCCCS). Even if the victim did not suffer physical injury, the defendant expressly agrees to pay restitution for expenditures and future expenses related to treatment for mental or emotional trauma suffered by the victims. Such expenditures shall include, but are not limited to: mental health treatment, counseling, and in-patient treatment. The defendant understands that such restitution will be included in the Court's Order of Judgment and that an unanticipated restitution amount will not serve as grounds to withdraw the defendant's guilty plea or to withdraw from this plea agreement.

e. Assets and Financial Responsibility. The defendant shall make a full accounting of all assets in which the defendant has any legal or equitable interest. The defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or transfer any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures). The defendant also expressly authorizes the United States Attorney's

- 4 -

Office to immediately obtain a credit report as to the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. The defendant also shall make full disclosure of all current and projected assets to the U.S. Probation Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Attorney's Office, including the Financial Litigation Unit, for any purpose. Finally, the defendant shall participate in the Inmate Financial Responsibility Program to fulfill all financial obligations due and owing under this agreement and the law.

f.    Acceptance of Responsibility. If the defendant makes full and complete disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's commission of the offense, and if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(a). If the defendant has an offense level of 16 or more, the United States will move for an additional one-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

g.    Non-Binding Recommendations.    The defendant understands that recommendations are not binding on the Court. The defendant further understands that the defendant will not be permitted to withdraw the guilty plea if the Court does not follow a recommendation.

**4.    AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

a.    Pursuant to Fed. R. Crim. P. 11(c)(1)(A), the United States Attorney's Office for the District of Arizona, at the time of sentencing, shall dismiss Counts 1, 3-11, 13-47, 50-52, and 54-56 of the Third Superseding Indictment (or the most recent Indictment in this case) against this defendant only.

b.    This agreement does not, in any manner, restrict the actions of the United States in any other district or bind any other United States Attorney's Office.

5.    **COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

a.    If the Court, after reviewing this plea agreement, concludes that any provision contained herein is inappropriate, it may reject the plea agreement and give the defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P. 11(c)(5).

b.    If the defendant's guilty plea or plea agreement is rejected, withdrawn, vacated, or reversed at any time, this agreement shall be null and void, the United States shall be free to prosecute the defendant for all crimes of which it then has knowledge and any charges that have been dismissed because of this plea agreement shall automatically be reinstated. In such event, the defendant waives any and all objections, motions, and defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional restrictions in bringing later charges or proceedings. The defendant understands that any statements made at the time of the defendant's change of plea or sentencing may be used against the defendant in any subsequent hearing, trial, or proceeding subject to the limitations of Fed. R. Evid. 410.

6.    **WAIVER OF DEFENSES AND APPEAL RIGHTS**

The defendant waives (1) any and all motions, defenses, probable cause determinations, and objections that the defendant could assert to the indictment or information; and (2) any right to file an appeal, any collateral attack, and any other writ or motion that challenges the conviction, an order of restitution or forfeiture, the entry of judgment against the defendant, or any aspect of the defendant's sentence, including the manner in which the sentence is determined, including but not limited to any appeals under 18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and 2255 (habeas petitions), and any right to file a motion for modification of sentence, including under 18 U.S.C. § 3582(c) (except for the right to file a compassionate release motion under 18 U.S.C. § 3582(c)(1)(A) and to appeal the denial of such a motion). This waiver shall result in the dismissal of any appeal, collateral attack, or other motion the defendant might file challenging the conviction, order of restitution or forfeiture, or sentence in this case.

- 6 -

This waiver shall not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics Op. 15-01 (2015)).

**7.     DISCLOSURE OF INFORMATION**

a.     The United States retains the unrestricted right to provide information and make any and all statements it deems appropriate to the U.S. Probation Office and to the Court in connection with the case.

b.     Any information, statements, documents, and evidence that the defendant provides to the United States pursuant to this agreement may be used against the defendant at any time.

c.     The defendant shall cooperate fully with the U.S. Probation Office. Such cooperation shall include providing complete and truthful responses to questions posed by the U.S. Probation Office including, but not limited to, questions relating to:

(1)     criminal convictions, history of drug abuse, and mental illness; and

(2)     financial information, including present financial assets or liabilities that relate to the ability of the defendant to pay a fine or restitution.

**8.     FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

Nothing in this agreement shall be construed to protect the defendant from administrative or civil forfeiture proceedings or prohibit the United States from proceeding with and/or initiating an action for civil forfeiture. Pursuant to 18 U.S.C. § 3613, all monetary penalties, including restitution imposed by the Court, shall be due immediately upon judgment, shall be subject to immediate enforcement by the United States, and shall be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts (which offset will not affect the periodic payment schedule). If the Court imposes a schedule of payments, the schedule of payments shall be merely a schedule of minimum payments and shall not be a limitation on the methods available to the United States to enforce the judgment.

9.    **ELEMENTS**

### Conspiracy (Count 2)

Beginning at a time unknown, but at least from on or about September 4, 2019 through on or about September 13, 2022, in the District of Arizona and elsewhere:

1.    There was an agreement between two or more persons to commit a violation of 18 U.S.C. § 2423(a), Transportation of a Minor for Criminal Sexual Activity; and

2.    The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

### Transportation of a Minor for Criminal Sexual Activity

Beginning at a time unknown, but at least from on or about September 4, 2019 through on or about September 13, 2022, in the District of Arizona and elsewhere:

1.    The defendant or co-conspirator knowingly transported or caused to be transported Jane Does 3-11 in interstate commerce;

2.    The defendant or co-conspirator did so with the intent that Jane Does 3-11 would engage in sexual activity for which any person can be charged with a criminal offense; and

3.    Jane Does 3-11 were under the age of eighteen years at the time.

### Conspiracy (Count 53)

Beginning at a time unknown, but at least from on or about November 26, 2022 through on or about December 1, 2022, in the District of Arizona and elsewhere:

1.    There was an agreement between two or more persons to commit a violation of 18 U.S.C. §§ 1201(a)(1) and (b), Kidnapping;

2.    The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

3.    One of the members of the conspiracy performed at least one overt act on or after November 26, 2022 for the purpose of carrying out the conspiracy.

### Kidnapping

Beginning at a time unknown, but at least from on or about November 26, 2022

- 8 -

through on or about December 1, 2022, in the District of Arizona and elsewhere:

1. The defendant or co-conspirator seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away Jane Does 4, 8 and 9;

2. The defendant or co-conspirator held Jane Does 4, 8 and 9 against their will;* and

3. The defendant or co-conspirator intentionally transported Jane Does 4, 8 and 9 across state lines, or traveled in interstate commerce, or used a means, facility, or instrumentality of interstate commerce.

* "If the victim is of such an age or mental state as to be incapable of having a recognizable will, the confinement then must be against the will of the parents or legal guardian of the victim." *Chatwin v. United States*, 326 U.S. 455, 460 (1946).

**10.    FACTUAL BASIS**

a. The defendant admits that the following facts are true and that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

Beginning in 2019, the defendant, SAMUEL RAPPYLEE BATEMAN, proclaimed himself to be a Prophet of the Fundamentalist Church of Jesus Christ of Latter-Day Saints ("FLDS"), a subset of the fundamentalist Mormon denominations whose members practice polygamy. At the time, most FLDS members recognized their imprisoned leader, Warren Jeffs, as the Prophet.

In 2019 and 2020, the defendant began taking female adults and children from his male followers and proclaiming them to be his "wives." The defendant amassed over twenty "wives," including child "brides" as young as nine years old. None of these "marriages" were legally recognized.

The defendant had followers residing in Lincoln, Nebraska; Cedar City, Utah; Monument, Colorado; and Colorado City, Arizona. He traveled to and between these locations to increase his following and claim "wives," ten of whom were under the age of eighteen. His intent was to engage in sexual activity with minor girls, and he did so on a regular basis. By March 2021, the defendant had moved his followers to Colorado City, Arizona, where he resided with his "wives" until September 13, 2022.

There were no legal or formal ceremonies to commemorate "marriage," but "marriage" signified the beginning of the defendant's sexual relationship with each of his "wives." Upon "marriage," the defendant engaged in sexual intercourse with his adult "wives" and impregnated several of them. He usually initiated physical contact with his child "brides" by hugging, kissing, and sleeping with them in the same bed, before ultimately engaging in sexual intercourse with them at a later time, except for Jane Doe 8.

The defendant originally resided in Colorado City, Arizona. Traveling between Arizona, Nebraska, Colorado, and Utah, the defendant and his co-conspirators began bringing his "wives," including his child "brides," back to Colorado City, Arizona. The defendant and his co-conspirators used cellular phones, other electronic devices, electronic communications, the Internet, vehicles, interstate highways, and hotels to induce, persuade, and encourage the minor victims to "marry" him, travel with and to him, and to engage in sexual activity.

As part of the conspiracy, the defendant and his co-conspirators engaged in sexual activity in the presence of minors. The defendant encouraged the minors to participate in the sexual activity and had his co-conspirators train them to do so. In one instance, the defendant and his co-conspirators engaged in a group sexual activity involving minors, using electronic devices and video communication to facilitate the participation of other co-conspirators and a minor in different states.

On or about September 4, 2019, the defendant traveled from Colorado City, Arizona, to Rifle, Colorado, to take his first adult "wife," co-defendant MARONA JOHNSON. The defendant took co-defendant MARONA JOHNSON back to Colorado City, Arizona, where he later impregnated her.

On or about October 26, 2019, after a trip from Colorado City, Arizona, to Lincoln, Nebraska, the defendant took the second of his adult "wives," S.J. The defendant took S.J. back to Colorado City, Arizona, where he later impregnated her. Both of these adult "wives" were the daughters of co-conspirator, M.J.

On or about March 26, 2020, the defendant spoke to M.J. and told him that God gave M.J.'s daughter, Jane Doe 6 (then age nine), to the defendant. On or about May 3, 2020, the defendant traveled from Colorado City, Arizona, to Lincoln, Nebraska, and at a hospital in Omaha, Nebraska, the defendant "rebuked" M.J. in front of his family.

On or between May 3 and May 5, 2020, the defendant, Jane Doe 6, and M.J.

- 10 -

sat in a van together, and then M.J.'s family was told Jane Doe 6 was going with the defendant. The defendant told M.J. he would be blessed for his loyalty. On or about May 4, 2020, the defendant took Jane Doe 6 as a child "bride."

On or between May 4 and May 8, 2020, the defendant took Jane Doe 6 from Lincoln, Nebraska, to Colorado City, Arizona. On or about May 8, 2020, the defendant took Jane Doe 6 to St. George, Utah, and had her lay on his lap as he drove.

On or between May 19 and August 9, 2020, the defendant had a video call with his biological daughter, showed her Jane Doe 6, and introduced Jane Doe 6 as his daughter's "new mother." The defendant told his daughter that Jane Doe 6 was nine years old, and that he "married" Jane Doe 6 "in full consent of her father." On or between May 19 and August 9, 2020, the defendant had another video call with his daughter, during which he hugged and kissed Jane Doe 6.

On or about June 4, 2020, the defendant documented in his journal that he chastened Jane Doe 6 "quite hard today because she wouldn't obey quickly, lingered and lingered until something had to change. After a while, she came weeping and confessing."

On or between June 6 and June 7, 2020, the defendant traveled with Jane Doe 6 from Colorado City, Arizona, to Lincoln, Nebraska.

On or about June 20, 2020, the defendant recorded in his journal that M.J. had been "laboring" with his seventeen-year-old daughter, co-defendant MORETTA ROSE JOHNSON, and she voiced "she wants to do Heavenly Father's will and asked her father [M.J.] to help her."

On or about June 28, 2020, the defendant returned from Lincoln, Nebraska, to Colorado City, Arizona, with Jane Doe 6. On or about June 30, 2020, the defendant sent a lengthy email to M.J. stating in relevant part: "[m]y heart is offended greatly at [J.J.] and [co-defendant MORETTA ROSE JOHNSON] for thinking evil of me, thinking I am doing my own thing. They need an example and don't have one. . . God is so offended at you for the way you have trampled over top of me that He gave me [co-defendant BRENDA BARLOW] and [co-defendant DONNAE BARLOW] . . . You can all reject it if you want, see if I care. Your children will fall by the dozens unless you repent in sackcloth and ashes." J.J. is M.J.'s legal wife. At the time, co-defendants BRENDA and DONNAE BARLOW were M.J.'s spiritual "wives."

- 11 -

On or about July 1, 2020, the defendant wrote in his journal "God seems to whisper '[Jane Doe 3]'." Jane Doe 3 was the fourteen-year-old daughter of M.J. On or about July 2, 2020, M.J. told the defendant that "the Lord" told M.J. to give the defendant his Toyota van.

On or about July 4, 2020, co-defendants BRENDA BARLOW, DONNAE BARLOW, and MORETTA ROSE JOHNSON traveled in M.J.'s Toyota van from Lincoln, Nebraska, to Colorado City, Arizona, to be with the defendant.

On or between July 3 and July 4, 2020, the defendant slept in the same bed with Jane Doe 6. On or about July 5, 2020, the defendant introduced his six wives, including Jane Doe 6, to his former wife, as well as co-defendant LADELL BISTLINE, JR.

On or about July 13, 2020, Arizona Department of Child Safety (hereinafter "AZ DCS") personnel visited the defendant's home in Colorado City, Arizona because of concerns involving Jane Doe 6. The defendant initially refused to allow them inside. He was present when AZ DCS personnel spoke to Jane Doe 6, and he gestured to her whether to answer their questions.

On or about July 14, 2020, AZ DCS contacted Jane Doe 6's mother, A.B., who was still residing in Lincoln, Nebraska. She justified Jane Doe 6 living with the defendant in Colorado City, Arizona, by saying Jane Doe 6 (still age nine) was helping care for her sister's baby.

On or about August 8, 2020, the defendant traveled to Cedar City, Utah to meet co-defendants LADELL BISTLINE, JR. and JOSEPHINE BARLOW BISTLINE and their three children, including Jane Doe 8 (then age nine) and Jane Doe 9 (then age ten). They all traveled from Cedar City, Utah, to Lincoln, Nebraska.

On or about August 10, 2020, the defendant conducted training on "the Prayer pamphlet" to M.J.'s family, co-defendants LADELL BISTLINE, JR. and JOSEPHINE BARLOW BISTLINE, and their three children, including Jane Does 8 and 9.

On or between July 1 and August 14, 2020, M.J. encouraged his daughter, Jane Doe 3 (then age fourteen) to marry the defendant. On or about August 13, 2020, the defendant met with Jane Doe 3 and listened to her "testimony" of "Uncle Warren [Jeffs] coming to her." On or between August 13 and August 14, 2020, the defendant took Jane Doe 3 (then age fourteen) as a child "bride."

On or about August 17, 2020, the defendant told M.J. that God told him that M.J.'s daughter, Jane Doe 5 (then age thirteen), belonged to the defendant. On or about August 18, 2020, M.J. told the defendant that Jane Doe 5 was ready whenever the defendant was.

On or between August 22 and August 23, 2020, as recorded by the defendant, he "slept with Angel Mother [Jane Doe 3] tonight!"

On or between August 18 and August 31, 2020, the defendant took Jane Doe 5 (then age thirteen) as a child "bride."

On or about September 5, 2020, the defendant and M.J. agreed that the defendant would move into M.J.'s house in Lincoln, Nebraska, with all his "wives" and take M.J.'s bedroom.

On or about September 25, 2020, the defendant "got after" Jane Does 3 and 5 "quite firmly for saying they wanted to be single again," until they both confessed to his satisfaction.

On or about September 27, 2020, the defendant told M.J. that God told the defendant that M.J.'s daughter, Jane Doe 4 (then age ten), "should be by my side." On or about September 29, 2020, the defendant took Jane Doe 4 as a child "bride."

On or about September 29, 2020, the defendant drove with M.J., J.J. and their daughter, Jane Doe 4, and the defendant kissed Jane Doe 4.

On or between September 29, 2020 and January 31, 2021, in M.J.'s bedroom that had been given to the defendant, the defendant was first "intimate" with Jane Doe 4.

On or between September 29, 2020 and March 18, 2021, the defendant touched Jane Doe 4's (then age ten or eleven) breasts in front of her mother, J.J., in a vehicle.

On or about October 25, 2020, the defendant sent text messages to one of his "wives," S.J., during Sunday School, about Jane Doe 7, saying "show [Jane Doe 7] this text" and "I see [Jane Doe 7] has made a great effort of improvement," which S.J. showed to Jane Doe 7.

On or about October 29, 2020, the defendant took M.J.'s wife, A.B., mother of Jane Does 5 and 6, as a "wife." On or about October 29, 2020, the defendant "rebuked" one of M.J.'s sons in front of others and told him "if he

- 13 -

stood up to harm me I would throw him through the wall. And that he had lost an eternal blessing in [Jane Doe 7]. God was going to give her to him but he spit in The Lord's face so He gave her to me." On or about October 29, 2020, the defendant took Jane Doe 7 (then age eleven) as a child "bride."

On or about October 29, 2020, the defendant took Jane Doe 7 from Lincoln to Omaha, Nebraska, and "rebuked her strongly" when she would not speak. The defendant told Jane Doe 7 if she didn't "want this I would take her back this instant. She repented quickly."

On or between October 29, 2020 and January 15, 2021, in Lincoln, Nebraska, the defendant was "intimate" with Jane Doe 7 (then age eleven or twelve).

On or about November 7, 2020, co-defendants JOSEPHINE BARLOW BISTLINE and NAOMI BISTLINE "married" the defendant. On or about November 7, 2020, co-defendant LADELL BISTLINE, JR. spoke to the defendant on the phone and told him that "The Spirit" told defendant BISTLINE, JR. that he would be "sealed" to the defendant.

On or about November 7, 2020, after the defendant spoke with co-defendant LADELL BISTLINE, JR. on the phone, M.J. told the defendant that God told M.J. he belonged to the defendant as well.

On or about November 7, 2020, the defendant called co-defendants BRENDA BARLOW and MARONA JOHNSON, and M.J. called his wife, J.J., and they all met at a hotel room. The defendant directed everyone to get naked and told M.J. and J.J. to perform sex acts in front of co-defendants BRENDA BARLOW and MARONA JOHNSON, so that they could learn how to sexually please the defendant.

On or about November 9, 2020, the defendant coordinated a "sacred ordinance" to emulate the "Washing of the Feet" in a hotel room in Lincoln, Nebraska. The defendant told everyone to get naked, washed the feet of M.J. and co-defendant LADELL BISTLINE, Jr., and then claimed he needed to have sex with M.J. to bond with him. When the defendant had difficulty getting an erection, he demanded the women and girls assist. J.J. and co-defendants BRENDA BARLOW and DONNAE BARLOW were there participating, as well as some of the child "brides."

On or about November 14, 2020, co-defendants LADELL BISTLINE, JR. and JOSEPHINE BARLOW BISTLINE traveled to Utah and purchased a white Yukon for the defendant.

- 14 -

On or about November 20, 2020, the defendant and co-defendant NAOMI BISTLINE left Lincoln, Nebraska with Jane Doe 3 and others. On or about November 21, 2020, the defendant and his "wives" stopped in Monument, Colorado to provide lessons to Jane Doe 11's family.

On or about November 23, 2020, in the evening, in Colorado City, Arizona, the defendant gave Jane Doe 3 and some of his other "wives" to co-defendant LADELL BISTLINE, JR. to comfort him since the defendant had taken co-defendant BISTLINE, JR.'s wife. The defendant also called some of his "wives" who were in Lincoln, Nebraska to tell them what he had done. Within hours, the defendant sent his followers a group text message taking back all of his "wives."

On or about November 24, 2020, the defendant and co-defendants NAOMI BISTLINE and JOSEPHINE BARLOW BISTLINE took co-defendants JOSEPHINE BARLOW BISTLINE's and LADELL BISTLINE, JR.'s daughters, Jane Does 8 and 9, along with co-defendant MORETTA ROSE JOHNSON (then age seventeen) and Jane Doe 3, to Cedar City, Utah, where they were stopped by law enforcement.

On or about November 24, 2020, after the law enforcement contact, and when they returned to Colorado City, Arizona, the defendant held Jane Doe 8's hand and said, "did you know that you belong to me?"

On or between November 24, 2020 and August 27, 2022, the defendant took Jane Doe 8 (then age nine or ten) as a child "bride." On or about November 24, 2020, after returning to Colorado City, Arizona, the defendant told co-defendant NAOMI BISTLINE and Jane Doe 3 to comfort co-defendant LADELL BISTLINE, JR. in a vehicle.

On or between November 25 and November 27, 2020, the defendant coordinated group sexual activity in a hotel room in Colorado Springs, Colorado, with some individuals participating via video call. The defendant told M.J. to have sex with co-defendant JOSEPHINE BARLOW BISTLINE while the defendant had sex with Z.B. Co-defendants NAOMI BISTLINE and MORETTA ROSE JOHNSON (then age seventeen), and Jane Doe 3, were also present and naked. M.J. initiated a video call with his wives, J.J. and P.B. The defendant initiated a video call with co-defendants MARONA JOHNSON and BRENDA BARLOW, and Jane Doe 6 also participated in the video call. The defendant also initiated a video call with co-defendant LADELL BISTLINE, JR., who was in Colorado City, Arizona. The defendant told everyone to be undressed so they could be part of it. The video participants, including Jane Doe 6, were naked.

- 15 -

On or between November 21 and November 28, 2020, the defendant sent an email to co-defendant LEIA BISTLINE saying God told him she had something to tell him. On or about November 28, 2020, the defendant sent a group text message informing everyone that co-defendant LEIA BISTLINE said God told her she belonged in the defendant's family.

On or between December 3 and December 6, 2020, the defendant picked up co-defendant LEIA BISTLINE from Monument, Colorado, to take her back to Lincoln, Nebraska. On or about December 5, 2020, the defendant took co-defendant LEIA BISTLINE as a "wife."

On or between December 20, 2020 and January 1, 2021, the defendant coordinated another group sexual activity in a hotel in Lincoln, Nebraska. M.J., J.J., Z.B., G.B. (a spiritual "wife" of co-defendant LADELL BISTLINE, JR.), and co-defendants DONNAE BARLOW, LADELL BISTLINE, JR., MARONA JOHNSON, and BRENDA BARLOW were present, as well as some of the minors. The defendant brought wine and told everyone to get naked. The defendant had sex with M.J., while the women and girls assisted the defendant in getting an erection.

On or about December 21, 2020, the defendant told M.B. (then age eighteen) she would be banished from eternal salvation if she would not follow him.

On or about December 25, 2020, the defendant touched Jane Doe 3's vagina in Lincoln, Nebraska, in her father M.J.'s bedroom that he gave to the defendant.

On or between December 31, 2020 and January 1, 2021, the defendant "rebuked" his "wives," including his child "brides," and told them to factory reset their phones.

On or between January 1, 2021 and September 12, 2022, the defendant was "intimate" with Jane Doe 7 (then age twelve or thirteen), in Colorado City, Arizona.

On or between January 1 and March 18, 2021, the defendant moved his "wives," including his child "brides," and other followers to Colorado City, Arizona.

On or about January 15, 2021, Jane Doe 7 was transported from Lincoln, Nebraska, and arrived in Colorado City, Arizona on January 16, 2021.

On or about January 18, 2021, the defendant, with some of his "wives" and

followers, traveled to Lincoln, Nebraska from Colorado City, Arizona.

On or between January 1 and March 1, 2021, M.B.B. and her daughter, Jane Doe 10 (then age fourteen), moved from Monument, Colorado to Colorado City, Arizona, around the same time the defendant and his "wives" were also moving back to Colorado City, Arizona.

On or between January 1 and April 30, 2021, the defendant slept with Jane Doe 10 and multiple "wives," including co-defendants NAOMI BISTLINE and LEIA BISTLINE. The defendant ordered everyone to take their clothes off, and the defendant had sex with co-defendant LEIA BISTLINE in front of and next to Jane Doe 10.

On or between January 28 and November 5, 2021, defendant took Jane Doe 9 (then age eleven) as a child "bride."

On or between January 1, 2021 and August 27, 2022, in Colorado City, Arizona, the defendant had sex with co-defendant MARONA JOHNSON in front of some of the minor girls, including Jane Doe 10, while some of the girls were touching the defendant.

On or between January 1, 2021 and August 27, 2022, in the green house, in Colorado City, Arizona, the defendant engaged in group sexual activity with Jane Does 3, 4, 7 and 10, and co-defendants NAOMI BISTLINE, BRENDA BARLOW and LEIA BISTLINE.

On or about February 21, 2021, M.J. and co-defendant LADELL BISTLINE, JR. dedicated to the defendant on a group call that they had given everything to the defendant, whom they referenced as "President Samuel R. Bateman," to include their "wives" and their children. The call was audio recorded and uploaded to YouTube.

On or about March 2, 2021, Jane Doe 11 went upstairs to the defendant with her mother (co-defendant LEILANI BISTLINE) to dedicate her life to "Father" (the defendant).

On or about March 3, 2021, Jane Doe 11 "married" the defendant.

On or about March 8, 2021, the defendant asked Jane Doe 10 if she had a testimony of where she was supposed to be.

On or between March 12 and March 13, 2021, the defendant took Jane Does 3, 4, 7, 9, and 11, and co-defendant NAOMI BISTLINE and others, back to

Lincoln, Nebraska to pick up Jane Doe 5 and the rest of the defendant's "wives" and their babies.

On or about March 15, 2021, in separate vehicles, the defendant and some of his "wives" started traveling back to Colorado City, Arizona, from Lincoln, Nebraska.

On or about March 16, 2021, co-defendant BRENDA BARLOW and others decorated the room for S.B. and Jane Doe 10, who were recently "married" to the defendant. The defendant arrived in Colorado City, Arizona that night.

On or about March 17, 2021, the defendant asked Jane Doe 10 to come to his room. Co-defendant LEIA BISTLINE brought Jane Doe 10 into the room where the defendant was with some of his other adult "wives." The other "wives" left, but co-defendant LEIA BISTLINE stayed. The defendant asked if Jane Doe 10 felt left out when she saw other girls touching him. She said "no," and the defendant said she was lying because he could see it in her eyes. The defendant then asked if she wanted to come to him, and she said "yes." They hugged and kissed, and the defendant told her she kissed just like co-defendant LEIA BISTLINE. The defendant and Jane Doe 10 laid together and she held his hand, touched his hair, and "touched him" all night long. Jane Doe 10 believed another girl was in bed with them. The next morning, the defendant woke up Jane Doe 10 by kissing her face all over.

On or about March 18, 2021, Jane Doe 11 and the people with whom she was traveling returned to Colorado City, Arizona.

On or between April 1 and April 30, 2021, the defendant had sex with Jane Doe 10, while co-defendant NAOMI BISTLINE, Jane Doe 5, and possibly Jane Doe 7 were present. Jane Doe 5 held Jane Doe 10's hand while the defendant was having sex with Jane Doe 10.

On or between April 1, 2021 and September 12, 2022, the defendant had anal sex with Jane Doe 10 (then age fourteen or fifteen).

On or between May 8 and May 11, 2021, the defendant and his "wives," including his child "brides," moved into the green house in Colorado City, Arizona.

On or about May 9, 2021, the defendant "married" Jane Doe 11's mother, co-defendant LEILANI BISTLINE.

On or about June 21, 2021, the defendant sent a group message to his "wives"

and followers that he would not go to the blue house until J.J. stops "bitching." J.J. was residing in the blue house with M.J. and the others who were not "married" to the defendant.

On or about June 29, 2021, as recorded by Jane Doe 10, the defendant took Jane Doe 10 for a ride to the creek, where they "worshipped our God in an unexpressable way" and had "holy sex."

On or between August 1, 2021 and August 9, 2022, in the green house in Colorado City, Arizona, the defendant had sex with Jane Doe 6 (then between ages ten and twelve), in front of Jane Doe 10 (then between ages fourteen and fifteen).

On or between August 1, 2021 and September 12, 2022, the defendant admitted to M.J. that he had anal sex with M.J.'s daughter, Jane Doe 6 (then between ages ten and twelve).

On or between August 1 and August 31, 2021, the defendant took Jane Doe 3 (then age fifteen) to Pigeon Canyon, Arizona, for their anniversary. They had sex. Jane Doe 3 described that the defendant would put his penis inside of her and then pull it out because he didn't want to get her pregnant.

On or about September 7, 2021, as recorded by Jane Doe 10, the defendant "slept" with Jane Doe 10 (then age fifteen).

On or between October 18 and October 19, 2021, co-defendant TORRANCE BISTLINE purchased a Bentley for the defendant.

On or about November 1, 2021, co-defendant LEIA BISTLINE contacted Jane Doe 7 and told her God had a "sacred mission" for her. Co-defendants LEIA BISTLINE and JOSEPHINE BARLOW BISTLINE picked up Jane Doe 7 and co-defendant NAOMI BISTLINE to take them to this "sacred mission." The defendant gave Jane Doe 7 (then age twelve) to co-defendant TORRANCE BISTLINE and watched him have anal sex with her. The defendant also gave co-defendant NAOMI BISTLINE to co-defendant LADELL BISTLINE, JR. and watched them have sex. The defendant called M.J. and told him to come over to his house in Colorado City, Arizona. M.J. arrived with his "wife," P.B.  Co-defendant JOSEPHINE BARLOW BISTLINE answered the door and took them to the defendant's bedroom. Co-defendants LEIA BISTLINE and JOSEPHINE BARLOW BISTLINE, and Jane Doe 5 (then age fourteen) were all there with the defendant, and they were all naked. The defendant said the Lord was requiring him to conduct a "sacred ordinance." He said "[co-defendant LEIA BISTLINE] is

- 19 -

with child and the Lord wants you [M.J.] to be with her, and I will be with [P.B.]." The defendant performed sex acts with co-defendant LEIA BISTLINE and Jane Doe 5. He touched Jane Doe 5's breasts and vagina. Later, the defendant announced what happened to all of his followers and explained that it was an "atonement" requiring him to sacrifice his most precious possessions, meaning his "wives" and child "brides."

That night of the "atonement," the defendant had sex with co-defendant NAOMI BISTLINE, while Jane Doe 11 was touching the defendant.

On or about November 5, 2021, the defendant and co-defendants NAOMI BISTLINE and TORRANCE BISTLINE went to Salt Lake City, Utah to pick up the second Bentley co-defendant TORRANCE BISTLINE purchased for the defendant.

On or about November 13, 2021, the defendant and others went to Salt Lake City, Utah, to pick up two Range Rovers, one of which was purchased by co-defendant LADELL BISTLINE, JR.

On or about January 29, 2022, the defendant took M.B., S.B., co-defendant LEIA BISTLINE, and Jane Doe 10 (then age fifteen) to a hotel room in Colorado. The defendant wanted M.B. to sleep with him, but she refused. He slept with Jane Doe 10 under a blanket and touched her vagina. Jane Doe 10 said it was not sex, but it kind of felt like it.

On or about February 16, 2022, the defendant traveled with Jane Doe 9 (then age twelve) and others to Las Vegas, Nevada, where they stayed in a hotel, and the defendant "slept" with Jane Doe 9.

On or about April 15, 2022, the defendant told M.B. to move her office to the blue house (John's) and not come to the green house (Roy's) because the defendant needed to teach and train his family. The defendant was angry with M.B. for not submitting to him.

On or between July 1 and September 12, 2022, the defendant had sex with Jane Doe 3 (then age sixteen) at campsites they visited that summer, including one in Apple Valley, Utah.

On or about August 28, 2022, the defendant was driving on the highway in Arizona with Jane Does 4, 7, and 8 in an attached box trailer. The defendant, co-defendants NAOMI BISTLINE and MORETTA ROSE JOHNSON, and Jane Does 9 and 10 (sitting in the passenger compartment) were pulled over by the Arizona Department of Public Safety. The defendant was arrested and

- 20 -

his cell phone was seized.

On or about August 28, 2022, the defendant called co-defendant TORRANCE BISTLINE from custody and told him to delete the defendant's Signal account, after the defendant's phone was seized by law enforcement.

On or about August 28, 2022, the defendant called his "wives" and instructed co-defendant BRENDA BARLOW to delete his Signal account and every message "right now," which the wives confirmed they were doing "right now."

On or about September 2, 2022, after the defendant was released on bond from state custody, the defendant inquired how he could factory reset his phone.

On or between September 2 and September 12, 2022, the defendant had sex with Jane Doe 5 (then age fifteen) in front of Jane Doe 10 (then age fifteen), and this was the first time Jane Doe 10 saw the defendant use a condom.

On or about September 12, 2022, in a trailer in Utah, the defendant had sex with Jane Doe 10, while co-defendant BRENDA BARLOW helped by touching the defendant.

On the morning of September 13, 2022, co-defendant BRENDA BARLOW and Jane Does 9 (then age twelve) and 10 went back to the trailer in Utah, where the defendant had stayed the night before with Jane Doe 10 and co-defendant BRENDA BARLOW. That morning, the FBI executed search warrants in Colorado City, Arizona.

On or about September 14, 2022, AZ DCS took legal and physical custody of the nine minor victims, who were the child "brides" of the defendant. Some of the adult "wives" snuck the children phones while they were in AZ DCS custody, so that they could communicate directly with each other, the defendant, and his "wives" while the defendant was in custody. The defendant would call and talk to each of the child "brides," telling them what he wanted to do to them sexually. Eventually, the defendant and his adult "wives" began discussing a plan for the girls to be taken from AZ DCS custody.

The defendant instructed his child "brides" what to say if they were ever interviewed.

On or about November 27, 2022, co-defendant BRENDA BARLOW

communicated with the defendant and many of his followers about the plan to assist the minor victims in leaving AZ DCS custody. At the time, co-defendant BRENDA BARLOW was attempting to ascertain Jane Doe 6's location.

Later, on or about November 27, 2022, co-defendants NAOMI BISTLINE, DONNAE BARLOW, and MORETTA ROSE JOHNSON assisted eight of the nine minor female victims (three of whom were under the age of fourteen) to leave the custody of the AZ DCS group homes in which they were staying pending delinquency proceedings following the September 13, 2022 arrest of the defendant, and their Court Authorized Removals.

Specifically, co-defendants NAOMI BISTLINE and DONNAE BARLOW picked up minor victims, Jane Does 7, 8, and 9, after the girls left AZ DCS custody on or about November 27, 2022.

Co-defendant MORETTA ROSE JOHNSON picked up minor victims, Jane Does 3, 4, 5, 10 and 11, after they left AZ DCS custody on or about November 27, 2022.

On the evening of November 27, 2022, the defendant made a recorded video call from the Core Civic/Central Arizona Florence Correctional Complex ("CAFCC"), where he was in federal custody, to co-defendant DONNAE BARLOW. During the video call, co-defendant DONNAE BARLOW was driving a vehicle and co-defendant NAOMI BISTLINE was the front-seat passenger. Co-defendant NAOMI BISTLINE informed the defendant that they had Jane Does 8 and 9, referenced by code names.

On or between November 27, 2022 and December 1, 2022, co-defendant BRENDA BARLOW communicated with and between the defendant and others to ascertain the status of the minor female victims and provide updates to the defendant.

On the morning of November 28, 2022, the defendant made a video call from CAFCC to co-defendant NAOMI BISTLINE, who appeared to be in a hotel room. In response to the defendant's questioning about who was with them, co-defendant NAOMI BISTLINE told the defendant that "W2" (a reference to Jane Doe 6, the only one of the nine girls to have not escaped from AZ DCS custody) was the only one not with them, but that they had tried and ran for their lives after police were called. The defendant told them they needed to get "W2." The video panned to all eight minors taken from AZ DCS custody.

In the following days, the defendant made numerous video calls to co-defendant NAOMI BISTLINE and the missing girls. At one point, the defendant asked if they were in "our state" and they stated that they were not.

On or about November 28, 2022, the defendant made video calls to co-defendant MORETTA ROSE JOHNSON's phone, where he spoke with co-defendant MARONA JOHNSON, who appeared to be in a hotel room with a baby and at least one other adult wife of the defendant. They talked about being a long way away. Co-defendant MARONA JOHNSON told the defendant that "we are helping you." The defendant encouraged co-defendant MARONA JOHNSON to stay strong.

After discussions about needing more vehicles, on another call on or about the evening of November 28, 2022, co-defendant LEILANI BISTLINE reported to the defendant that she had cleaned out one of the vehicles and she and co-defendant JOSEPHINE BARLOW BISTLINE were able to swap out vehicles with the other wives of the defendant.

In the days following the girls' disappearance, co-defendant BRENDA BARLOW was communicating with the defendant and all of his followers, coordinating and reporting everybody's whereabouts.

On or about December 1, 2022, all eight missing girls were found in Spokane, Washington.

b.     The defendant shall swear under oath to the accuracy of this statement and, if the defendant should be called upon to testify about this matter in the future, any intentional material inconsistencies in the defendant's testimony may subject the defendant to additional penalties for perjury or false swearing, which may be enforced by the United States under this agreement.

## APPROVAL AND ACCEPTANCE OF THE DEFENDANT

I have read the entire plea agreement with the assistance of my attorney. I understand each of its provisions and I voluntarily agree to it.

I have discussed the case and my constitutional and other rights with my attorney. I understand that by entering my plea of guilty I shall waive my rights to plead not guilty,

- 23 -

to trial by jury, to confront, cross-examine, and compel the attendance of witnesses, to present evidence in my defense, to remain silent and refuse to be a witness against myself by asserting my privilege against self-incrimination, all with the assistance of counsel, and to be presumed innocent until proven guilty beyond a reasonable doubt.

I agree to enter my guilty plea as indicated above on the terms and conditions set forth in this agreement.

I have been advised by my attorney of the nature of the charges to which I am entering my guilty plea. I have further been advised by my attorney of the nature and range of the possible sentence and that my ultimate sentence shall be determined by the Court after consideration of the advisory Sentencing Guidelines.

My guilty plea is not the result of force, threats, assurances, or promises, other than the promises contained in this agreement. I voluntarily agree to the provisions of this agreement and I agree to be bound according to its provisions.

I understand that if I am granted probation or placed on supervised release by the Court, the terms and conditions of such probation/supervised release are subject to modification at any time. I further understand that if I violate any of the conditions of my probation/supervised release, my probation/supervised release may be revoked and upon such revocation, notwithstanding any other provision of this agreement, I may be required to serve a term of imprisonment or my sentence otherwise may be altered.

This written plea agreement, and any written addenda filed as attachments to this plea agreement, contain all the terms and conditions of the plea. Any additional agreements, if any such agreements exist, shall be recorded in a separate document and may be filed with the Court under seal; accordingly, additional agreements, if any, may not be in the public record.

I further agree that promises, including any predictions as to the Sentencing Guideline range or to any Sentencing Guideline factors that will apply, made by anyone (including my attorney) that are not contained within this written plea agreement, are null and void and have no force and effect.

I am satisfied that my defense attorney has represented me in a competent manner.

I fully understand the terms and conditions of this plea agreement. I am not now using or under the influence of any drug, medication, liquor, or other intoxicant or depressant that would impair my ability to fully understand the terms and conditions of this plea agreement.

3-15-24
Date

SAMUEL RAPPYLEE BATEMAN
Defendant

## APPROVAL OF DEFENSE COUNSEL

I have discussed this case and the plea agreement with my client in detail and have advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the constitutional and other rights of an accused, the factual basis for and the nature of the offense to which the guilty plea will be entered, possible defenses, and the consequences of the guilty plea including the maximum statutory sentence possible. I have further discussed the concept of the advisory Sentencing Guidelines with the defendant. No assurances, promises, or representations have been given to me or to the defendant by the United States or any of its representatives that are not contained in this written agreement. I concur in the entry of the plea as indicated above and that the terms and conditions set forth in this agreement are in the best interests of my client. I agree to make a bona fide effort to ensure that the guilty plea is entered in accordance with all the requirements of Fed. R. Crim. P. 11.

3-15-24
Date

MYLES SCHNEIDER
Attorney for the Defendant

- 25 -

## APPROVAL OF THE UNITED STATES

I have reviewed this matter and the plea agreement. I agree on behalf of the United States that the terms and conditions set forth herein are appropriate and are in the best interests of justice.

GARY M. RESTAINO
United States Attorney
District of Arizona

DIMITRA SAMPSON
Digitally signed by DIMITRA SAMPSON
Date: 2024.03.13 16:46:31 -07'00'

_____
Date

DIMITRA H. SAMPSON
JILLIAN BESANCON
RYAN POWELL
Assistant U.S. Attorneys

## ACCEPTANCE BY THE COURT

12.9.24
_____
Date

_____
HONORABLE SUSAN M. BRNOVICH
United States District Judge

- 26 -