## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 3:22-cr-08092-SMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | December 9, 2024 |
| Samuel Rappylee Bateman, | ) | **REDACTED** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE SUSAN M. BRNOVICH, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**SENTENCING**</u>

APPEARANCES:

For the Plaintiff:
    U.S. ATTORNEY'S OFFICE
    By:  **Ms. Dimitra H. Sampson, Esq.**
        **Mr. Ryan D. Powell, Esq.**
        **Ms. Jillian Besancon, Esq.**
    2 Renaissance Square
    40 N Central Ave., Ste. 1800
    Phoenix, AZ 85004

For the Defendant Samuel Rappylee Bateman:
    LAW OFFICE OF BRIAN F. RUSSO
    By:  **Mr. Brian F. Russo, Esq.**
    10037 E Dynamite Blvd., Ste. C-110
    Scottsdale, Arizona 85262
Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

**P R O C E E D I N G S**

COURTROOM DEPUTY:  On the record in criminal docket 22-8092, United States of America versus Samuel Rappylee Bateman, before the Court for sentencing.

MS. SAMPSON:  Good afternoon, Your Honor.  Dimitra Sampson, Ryan Powell, and Jillian Besancon appearing on behalf of the United States.

MR. RUSSO:  Good afternoon, Your Honor.  Brian Russo on behalf of Mr. Bateman, who is present standing next to me at the podium.

THE COURT:  And, again, sir, would you state your full name and date of birth.

THE DEFENDANT:  Samuel Bateman, Samuel Rappylee Bateman, ███76.

THE COURT:  All right.  We are set for sentencing.

You pled guilty before this Court and the Court accepted your plea.

Based on that plea, it is now the judgment of the Court that you are guilty of the crimes of Conspiracy to Commit Transportation of a Minor for Criminal Sexual Activity, in violation of Title 18 of the United States Code, Section 2423(a) and 2423(e).  That's a Class A felony.

It is further the judgment of the Court that you are guilty of Count 53, Conspiracy to Commit Kidnapping, in violation of Title 18, United States Code, Section 1201(c).

That's a Class A felony.

I have read and considered the written presentence report.

Have both counsel read the presentence report?

MS. SAMPSON:  Yes, Your Honor.

MR. RUSSO:  Yes, Your Honor.

THE COURT:  And, Mr. Bateman, did you have an opportunity to read the presentence report?

THE DEFENDANT:  Yes.

THE COURT:  It's quite lengthy.  Did your attorney meet with you to discuss that report?

THE DEFENDANT:  Yes.

THE COURT:  Did he answer all your questions?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand what the presentence report says?

THE DEFENDANT:  Yes.

THE COURT:  All right.  The Court accepts your plea agreement and the judgment and sentence will be consistent with it.

I am satisfied the plea agreement adequately reflects the seriousness of the actual offense behavior, and that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines.

In your case, the guidelines were calculated as

follows:

The offense level is 43, and your Criminal History Category is a I, so the guidelines provide for the following ranges of sentence:

A lifetime in custody, supervised release for a period of five years to life on Count 2, and two years to five years on Count 53.  Probation is not available.  There is a fine of between $50,000 and $250,000 on each count.  Restitution is mandatory.  And there are some special assessments.

Are there any objections to the guideline calculations?

MS. SAMPSON:  No, Your Honor.

MR. RUSSO:  No, Your Honor.

THE COURT:  Okay.  In addition to the presentence report, I did preside over the trial of two of the co-defendants.  I have considered the sentencing recommendation from the government and from the defense, and two letters from two of the victims.

Mr. Russo -- oh, wait, before we hear from the parties, I understand there are some people that want to speak.

MS. SAMPSON:  Your Honor, yes.  Some of the victims would like to make a statement to the Court.

Also, counsel for Naomi Bistline had provided, this afternoon, a letter.  I wanted to make sure the Court had that as well.

THE COURT:  Yes, that's one of the letters.

MS. SAMPSON:  Okay.  Thank you.

THE COURT:  And you have that, Mr. Russo?

MR. RUSSO:  I was given the opportunity to review it before.

THE COURT:  All right.  So, Mr. Bateman, we're going to have you take a seat back at the table so I can hear from the victims.

MS. SAMPSON:  All right.  Your Honor, JD 6 would like to make a statement to the Court first.

THE COURT:  Okay.  Would you state your full name and then tell me what you want me to hear.

VICTIM JD 6:  My name is JD 6.

And, Your Honor, I am here today to share how the experience of sexual abuse has impacted my life and the lives of those around me.

This abuse began when I was just nine years old, and continued for months, with the final event occurring about one month before I was brought into the foster system.  The effects of this abuse are still with me and I want the Court to understand the depth of that impact.

As a child, I had no way of understanding what was happening to me.  I was too young and the abuse shattered my sense of safety.  The violation of my privacy and the theft of my childhood have left deep scars that have stayed with me

every day.

I feel as though my innocence was stolen, and as a result, I was deprived of the normal experiences that other children get to have.

The emotional and psychological effects have been overwhelming.  I have developed PTSD, which makes it hard for me to connect with others, especially people my age.  I often feel discomfort when I am around new men and find it hard to trust people.  The trauma I endured has created emotional distance in my relationships, making it difficult for me to fully open up or feel safe with others.

I also want to emphasize how deeply it has affected my family as a whole.  My sisters, who are survivors as well, have had to cope with their own trauma while trying to maintain their relationships with me.  This abuse has created a ripple effect that has touched everyone I love.

Throughout this process, I have been incredibly lucky to have foster parents who have shown me patience, love, and support.  They have helped me navigate the painful emotions that came with the trauma I've experienced, and I wouldn't be where I am today without their unwavering care.  They have truly been a guiding force for me, helping me heal and find hope again.

Additionally, my aunts and uncles have also been a source of strength for me.  Their support has been invaluable,

and I have felt their love and care at every step of this journey.  They have given me a sense of stability and have helped -- and have helped me feel like I belong, no matter how difficult things have been.  I am deeply grateful for their presence in my life.

Despite all this pain, I am determined to use my experiences to become a better person.  I sought counseling and it has helped me understand and cope with the trauma.  There are days when it feels like too much to bear, but I continue to move forward because I want to heal for myself and for the sake of my family who have stood by me through everything.

I would now like to just address the defendant.

Sam, you have no power over me.  And despite what you may think, I am no longer a little puppy running to your every command.  I am now a proud, young woman who will continue to grow bolder and stronger every day.  I hope that you feel the pain you caused me as you sit rotting in your cell.

Justice for me would mean the longest sentence possible for the defendant.  I believe that someone who commits such acts should be locked away forever, not only to protect others, but because they have done irreparable damage to people's lives.  Throughout this process, I have met many kind and considerate people within the legal system who have shown me care and respect.

However, I also believe there are areas where the

system could improve.  My foster parents have seen firsthand the challenges families and survivors face, and I think they would be happy to suggest changes to the system that would make the process easier for others who are going through what I have.

While I still struggle, I am finding ways to grow.  I want the Court to understand that this experience has caused me immeasurable pain, but I am using this opportunity to become stronger.  The support of my foster parents, aunts and uncles, have been vital to my journey.  I hope that this statement helps the Court understand the full impact this has had on us.

Thank you for hearing my statement.

THE COURT:  Thank you for coming.

MS. SAMPSON:  JD 11 would like to make a statement to the Court, Your Honor.

THE COURT:  Okay.

VICTIM JD 11:  My name is JD 11.

Samuel, a 14-year-old should never have to experience all the horrors you put me through.  I remember you belittling me along with and in front of others about being shy.  While doing this, you actually turned me into more of an introvert, because everything I did in your eyes was never good enough.  But regardless of this, I have now gone out and become an actor in high school and am making myself into the extrovert I want to become.

And just to make it clear, I didn't do this for you, I did it for myself, because I am my own boss now and you can't control me anymore.  I was 14-and-a-half years old when you told me to spiritually marry you.  That is too young.  I wasn't even old enough to make decisions for myself yet, so you somehow brainwashed my mom into getting me to marry you, then a few weeks later you started having sex with me.  I wasn't even old enough to consent to that and you know it.

Regardless of you making me do this -- these things and trying to ruin my chance of ever having a normal relationship with a boy, I am now in high school and have been flirting with this boy at school who is my same age who is really cute, and he is all the things you'll never be.  If you hadn't ever come along, I'd still have a good relationship with my family, and with my mom especially.

You also messed up my relationships with my brothers by sexualizing them and trying to put thoughts in my head about them that I would have never even considered otherwise.  You haven't stopped me from repairing these relationships though, because I now hang out with my brothers regularly and am getting to know them the way that I should.

You made it so that I am behind in school by trying to turn me into an adult with the duties of a grown up, so now it will take me a while to catch up.  But even though you did that, I have moved to an alternative school to catch up on my

work so that I can still graduate on time.

You affected my social life as well by not allowing me to chitchat with anyone around me.  I am still struggling with being social and with my confidence because of it, but I am not letting that hinder me.  I have been making friends at school, and even some guy friends.

Sam, you hurt me physically and emotionally, more than you'll ever be able to comprehend, and you have messed up my life so much that it will take a long time to fix.  But regardless of everything you have done to me, and all the ways you have tried to break me, I am an adult now who makes all of my own decisions, and I am becoming a strong woman who knows who she is and what she wants in every aspect of life.

I also just want to let you know that I know you were never doing anything for God, but you were doing it all for power and personal gain.  You have made me into a person who is very self-aware and now on edge all the time.  I am now constantly looking over my shoulder to make sure that I am safe.

I am also afraid of all men because of you, and so it's difficult for me to have normal relationships with them. So now I am in therapy and I'm on medication for my anxiety and nightmares you gave to me, but I'm healing from it one day at a time.  It's a slow process, but I hope to eventually get over all the trauma and emotional pain you caused me.  You can't

stop me from going forward and accomplishing all my goals in life. But just to clarify, I'll never forgive you for what you did to me.

Before I go, I just want to take a moment to share with you all the things I have accomplished since being away from you. I am in high school. I got my driver's license. And I now wear whatever clothes I want, whenever I want. I also dyed my hair and cut bangs in it. And I was in my school play that happened last month. Now you can see that I never needed you, and I hope you get everything in life that you deserve, which is absolutely nothing. You deserve no compassion or anything good to ever come to you in life.

MS. SAMPSON: Your Honor, JD 5.

VICTIM JD 5: Your Honor, thank you for the opportunity to stand here today and deliver this statement.

I'm not here for the 17-year-old girl that I am now, a girl who has a safe home, who goes to school every day, who has a loving family, great friends, and an amazing community. I am here for the child who doesn't have a voice, who is being exploited, who wakes up every day a slave to the twisted passions of an evil person. I am here for that child because I was that child.

For more than two years, along with nine other little girls, that was my life, all of us suffering at the hands of the man who sits sin the defendant's chair today. We lived

every moment knowing that whatever Sam wanted is what Sam would get. And he used this to his advantage. If he decided that one of us was going to sleep with him, there was nothing we could do to stop him. And he convinced us that if we didn't want to be a part of it, we were the problem. After all, according to Sam, this is what God wanted. This, of course, gave him all the power to get what he wanted and left us feeling the shame and guilt if we didn't cooperate.

Despite what he would say, we meant absolutely nothing to him. We were toys that he played with when he wanted to and then left on the shelf when he didn't. To him we were not girls, not children, not humans. We had no dignity or value. We were objects that he used for his selfish pleasures.

And although I'm thankful that it all came to an end one day, there are now scars that will never go away. If you've never experienced abuse like this, you don't know what it feels like to try to heal from it, so here's what it's like.

It's not daring to feel the pain because you don't know if you can stand it. It's lying in your bed at night wondering if you even matter to anyone. It's endless therapy sessions full of tears that seem to solve nothing. It's not daring to trust anyone because you don't want to be hurt again. It's a heart that is shattered into a billion pieces that seem impossible to put back together. It's realizing that you will never get your childhood back. The scars haunt you and they

never go away.

At this point, Your Honor, I'd like to address the defendant.

Sam, I'm not going to try to make you realize the pain that you have caused.  I don't think you will ever understand and I don't think you care.  But I will be perfectly honest.  You hurt me deeply.  What you did was evil.  It was wicked and shameful.  It was absolutely horrible, and you deserve far more than whatever sentence you're about to receive.  You have caused more pain than I know how to express.  You sinned against me and you left wounds that will never fully heal in this life.

But more troubling than the fact that you sinned against me is the fact that you sinned against God.  Nothing you have done has escaped the perfect justice of God.  And I promise, you don't want to meet him before you deal with it.  But here's the thing, I have also sinned against God for many years, despite living a very religious life.  I was actually running from God in an effort to try to save myself.  And it was only when I realized that no amount of work that I put in would reconcile my sinful heart to a Holy God, and that's when I became truly free.  Because it was then that I realized that I needed Jesus to save me.  He's the only answer to our sin problem, and he has offered to pay for it all through his death on the cross.  A free gift of grace.

I have accepted his forgiveness for my sin, and because I have been forgiven, I can honestly say that I forgive you.  Because of Jesus, your actions do not define me.  He defines me and has given me a new identity.  He is the reason that I don't hate you.  He is why I can stand here today and say that I truly hope that you will someday come to know the Jesus of the Bible, because more than you need forgiveness from me, you need forgiveness from him.

I hope that you will one day feel the full weight of guilt for what you have done, because when you do, you'll realize just how badly you need Jesus, and I truly hope that you find him.

Your Honor, I'm not asking you today to give Sam the sentence that he deserves, because I don't think that's possible.  There were ten little girls who lost so much to the actions of this man.  There is no penalty that you could give him that would replace the years that he has taken from us. There is no amount of years that will undo what he did.  No amount of time will make us those little girls again.

But what I will ask is that with whatever sentence you hand down, you make a statement to these girls that they are seen, they are valued, they have dignity, and they deserve to be protected.

I am asking you to send a message to all abusers of children about what the United States justice system will do to

protect these vulnerable people.  I am asking that when you look at all the evidence, all the crimes, all the evil, you see the people who were affected.  I am asking you to see the faces behind the Jane Does, because every Jane Doe is a person with a real name and a real life.  Every one of them is somebody's daughter, somebody's sister, or somebody's best friend.

So, Your Honor, with whatever sentence you hand down today, please see us.

Thank you.

THE COURT:  Thank you.

Is that everybody?

MS. SAMPSON:  Yes, Your Honor.

THE COURT:  All right.  Mr. Bateman, if you'd come back up to the podium.

Mr. Russo.

MR. RUSSO:  Thank you, Your Honor.

Judge, first, let me point out I know you have read, so I'm not going to go over everything in detail, I just want to point out a few things.

First, Judge, let me point out that overly harsh, even life sentences, aren't a deterrent.  There are people who have been convicted of the same offenses as Mr. Bateman who are serving life sentences, obviously, not a deterrent.  We have to reconcile the conduct, the person, and look at all the factors.

As I pointed out, Judge, the two things that I think

are important in Mr. Bateman's particular situation are the treatment that was recommended.  I think treatment is an indicator, and it has been successful for the victims in this case, and obviously educated their opinions and opened their opinions to what the law, and in conformity with the law, meaning that treatment can be effective.

The doctor opined as to the specific treatment and that treatment could be effective.  Twenty years would be an effective period of time to accomplish that.  There is no logical, medical, or rational reason that anything over 20 years would be necessary to accomplish that particular goal.

The other thing I tried to point out, Judge, is disparity.  There are people in our jurisdiction, there are people in this particular case, one of whom got the highest sentence, which was 15 years.  Mr. Bateman's potential sentence -- lowest potential he could receive is five years more than that for the same offense conduct.

His high end is more than double the low end.  I've not -- I've been practicing for a long time, I've not ever seen a plea agreement that gives such a wide range to the Court and its discretion.  Nevertheless, there is no legitimate reason that he would serve more time, and that that would do anything to change that conduct, other than the time it would take to do the treatment.  I tried to point that out.  I tried to get the Court to recognize that.

I think the Court recognizes the difficult situation I'm in. I'm not here to tell you any arguments that don't have any good faith or to shame the victims here, other than to say that Mr. Bateman believed in what he was doing. He recognized that it was wrong but still believed in it. And I'm not saying that's an excuse, but it was because he was brought up the same way others were brought up, to believe and to normalize this behavior.

It's not an excuse. It's telling you contextually what happened. So if you logically believe that that's true, because the victims told you that, the doctor told you that, then you, at least to a certain extent, have to accept that Mr. Bateman was in the same situation and could benefit from the same treatment.

Thank you, Your Honor.

THE COURT: Okay. Mr. Bateman, is there anything you want to say before I sentence you?

THE DEFENDANT: (No audible response.)

THE COURT: No?

THE DEFENDANT: (No audible response.)

THE COURT: Okay. From the government.

MS. SAMPSON: Your Honor, may I approach? May I speak from the lectern?

THE COURT: Yes.

Mr. Bateman, can you go have a seat back there.

MS. SAMPSON:  Your Honor, we may be presenting an exhibit or two as well, which we've tested with Ms. Garcia before we started.

THE COURT:  Okay.

MS. SAMPSON:  Your Honor, this story is theirs to tell.  Some of the girls who have addressed this Court, some of the girls whom this Court heard from during the Bistline trial, they were the ones who lived it, they were the ones who survived it, so I cannot say anything any better than they have.  Their words will be more important and more poignant than anything that I will say today.

I do want to remind the Court what this case was about and who -- I'm hesitating to use the word victimized, because I heard the girls say that they were survivors and not victims, and so I want to honor that.  And I think that they're right about that.  And we'll start with Jane Doe 2.

And JD 5 was right, there are faces and names behind the Jane Does.  Jane Doe 2, this is Moretta Johnson.  She was given to Sam Bateman in July 2020 when she was 17 years old.

Jane Doe 3, JD 3, was given to Sam Bateman in August 2020 when she was 14.

Jane Doe 4, JD 4, was given to Sam Bateman in September 2020 when she was 10.

Jane Doe 5, JD 5, was given to Sam Bateman in August 2020 when she was 13.

Jane Doe 6, JD 6, was given to Sam Bateman in May 2020 when she was 9 years old.

Jane Doe 7, JD 7, was given to Sam Bateman in October 2020 when she was 12.

Jane Doe 8, JD 8, was turned over to Sam Bateman in November 2020 when she was 9.

Jane Doe 9, JD 9, turned over to Sam Bateman in November 2020 when she was 10.

Jane Doe 10, JD 10, was given to Sam Bateman in March 2021 when she was 14.

And Jane Doe 11, JD 11, given to Sam Bateman in March 2021 when she was also 14.

Your Honor, at the beginning of the Bistline trial, my co-counsel told the jury that this case was about the power and the control that these defendants used to create a child sex abuse ring in a community where the men had all the power, the women had much less power, and the children certainly had none.

The letter that this Court received from co-defendant Naomi Bistline talks about this power differential. And she was an adult. These girls, these survivors, are the definition of strength and resilience. As they told Sam Bateman today, they have taken the power and the control over their own lives back.

Sadly, as this Court is aware, there are adults who still support Sam Bateman to this day, including some of these

girls' parents, many who show up to various court hearings, not in support of their daughters, but in support of the man, or the men, who were abusing them.  It is mind boggling and goes against every natural parental instinct.  But these girls have now become the adults in the room, and they are the role models now for others that their parents should have been for them.

I want to address something that has been talked about a lot in this case, and that is the FLDS community and its belief systems.  This Court has heard testimony about the FLDS, its teachings, and its traditions.  This case is not about the FLDS.  Child sex abuse is not part of the teachings of the FLDS.  The individuals who participated in this child sex abuse ring had choices.  This was not about religion or what God told any of them to do.  Most of the FLDS community knew this and they made choices to reject Sam Bateman, the defendant being sentenced here today.

This Court heard about a number of people who rejected the defendant and what his coconspirators were doing.  For starters, the defendant's own wife.  When the defendant tried to marry his 13-year-old daughter and wanted to have a baby with her, the defendant's wife, in a community where the men have all the power and the women have none, stood up to the defendant and protected her daughter.  She divorced him, got a restraining order against him, and took her daughter to safety where the defendant could no longer try to harm her.

And she wasn't the only one who stood up to the defendant. This Court heard during trial some of the young girls and women who rejected the defendant. Co-defendant LaDell Bistline's in-laws rejected the defendant from the moment they met him, and this Court heard during the trial against LaDell and Torrance Bistline how they warned LaDell about the defendant and he didn't listen because he was part of the conspiracy.

The only men in the community who supported the defendant were the ones who wanted something out of promoting the defendant as a prophet. As this Court understands now, and as set forth in the United States' sentencing memorandum, Warren Jeffs, the previously recognized prophet of the FLDS, who was imprisoned for conduct similar to the defendant, child sex abuse, issued an edict voiding all marriages, prohibiting new marriages or sexual activity, and prohibiting having children in the FLDS community.

The defendant and his coconspirators, responding to this edict, made up their own teachings and their own religion to manipulate their own community and get what they wanted: new wives, sexual activity, and more children.

This Court heard a number of recordings during the Bistline trial. I'm not going to replay those. We've chosen just a few excerpts, very short, to play for the Court. One of them is Exhibit 321 which was marked but never admitted in

trial.  And this is an excerpt from that recording.

(Playing Exhibit No. 321.)

MS. SAMPSON:  Even out of the defendant's own mouth, this had nothing to do with religion.  They simply made up their own teachings to try to justify what they were doing.  This was a small group of men doing what they wanted to get what they wanted, and it was these children who paid the price.

The defendant was the ringleader of this child sex abuse ring.  He sexually abused the young girls who were given to them by their fathers, and some of them by their mothers, on a daily basis.  How confusing for these poor girls when many of their parents stood by, and not only allowed the defendant to sexually abuse them, but encouraged their relationships with him.

The defendant began to isolate the girls.  He controlled every aspect of their lives.  He told them what to wear; what to eat; where to sleep; how to think; what to say.  He encouraged them to hide and to lie if they were ever questioned about what was going on.

He forced them to sleep naked and have sex with him, and even to touch each other.  He publically humiliated them.  He corrected and rebuked them for having what are normal thoughts as children.  He organized group sexual activity with the kids and other adults.  Sometimes he let his male coconspirators participate in events that he called sacred

ordinances.

As this Court is aware, on one occasion during the sacred ordinance called the atonement, the defendant actually gave his wives and one of his child brides for his male coconspirators to rape, including the defendant watching co-defendant Torrance Bistline rape 13-year-old Jane Doe 7 in front of a room full of people, while the defendant himself raped another child.

The defendant claims he never forced anyone to do anything, but make no mistake, these girls did not want this.

I'd like to play Exhibit 310 that was never played for this Court before.

(Playing Exhibit No. 310.)

MS. SAMPSON:  The defendant himself knew and bragged about how none of the girls wanted to be with him, but they were forced to go with him by some of their parents or caretakers.  This may have felt right for the defendant and his coconspirators, but nothing about this felt right for the victims, and they knew that all along.

Only now, as this Court has heard, are they in a safe place where they can verbalize their dissent and make their own decisions.  He cannot control them anymore.  They cannot be controlled anymore.

The defendant and his coconspirators not only created and participated in this child sex abuse ring, they lied about

it to authorities and they tried to cover it up.  This Court heard during the Bistline trial some of the phone calls that the defendant made to the victims and some of his coconspirators from jail.

The Court heard about all of the defendants' and the other coconspirators' attempts to obstruct justice, whether it was hiding and destroying evidence, deleting the encrypted cell phone messaging app Signal, threatening cooperating witnesses, and attempting to tamper with witnesses or tell them not to talk, or the defendant orchestrating, along with some of his coconspirators, the kidnapping of the victims from DCS custody in November of 2022.

But for the courage of a few very brave people who were willing to come forward and tell law enforcement what was going on, not knowing the fate they would face; and but for the courage of a couple of brave individuals who were there to help the community and urge law enforcement to look into this; but for the courage of, and the diligence of the FBI in investigating this case, the defendant and his coconspirators fully intended to continue to grow this conspiracy, and may have even been able to do so.

The defendant didn't do this alone.  He needed his coconspirators to help him.  When he pled guilty back in April, as this Court will recall, I believe the defendant thought his co-defendants would follow suit and do the same.  Well, some of

them didn't, which was their right, but was also further evidence that they were not in this for the defendant. All of these individuals were in it for themselves.

But the defendant did enter a guilty plea. He took responsibility. He agreed to every single fact in the 15-page factual basis, from taking wives, to having sex with children, organizing group sexual activity, and obstructing justice. So even though the presentence report paints a picture of the defendant making statements not taking responsibility the way he did when he pled guilty, it is an important fact that is worthy of consideration by this Court, and the reason that the plea agreement was given to him, capping his sentence at 50 years. He at least attempted to spare the victims from having to testify against him, even though it didn't turn out that way.

I do want to address one comment Mr. Russo made about sentencing disparity. As this Court is well aware, Mr. Russo is addressing a female co-defendant and described her as similarly situated to the defendant. As this Court is aware, their situations aren't even close. That defendant received a 15-year sentence.

The defendant's conduct in this case was horrific. He is almost 49 years old. The plea agreement allows this Court to sentence the defendant up to 50 years, which even with the time he has already served since 2022, is essentially a life

sentence.  This is the only appropriate sentence here and nothing less.

The plea agreement does serve the interest of justice. It allows for a sentence that reflects the horrific nature of the defendant's crimes, takes into account his history and characteristics, which the Court has heard about in this proceeding and others.  It does provide for just punishment, adequate deterrence, and is not greater than necessary to satisfy the goals of federal sentencing.

The sentence also takes into account the enormous amount of pain and suffering the defendant and his coconspirators caused to the victims and to an entire community.

I'd like to have my co-counsel play a couple of exhibits again that were not admitted at trial.  The first is 300, the next will be 301.  He'll play them back-to-back.

(Playing Exhibit Nos. 300 and 301.)

MS. SAMPSON:  These are calls that the defendant made from jail.  This was the real Sam Bateman.  There was nothing pure about his intentions.  There was nothing sincere about his beliefs.  This was not about love.  This was not about religion, certainly was not about the Word of God.  He didn't want anyone interfering with his criminal activity, his child sex abuse ring, or destroying what he and his coconspirators had created for themselves.

I want to again thank the victims for their bravery and for being here and for being here at other proceedings. I know it was difficult for them. I'm glad the Court had the opportunity to hear directly from them.

Your Honor, the United States respectfully requests that this Court accept the plea agreement, and find that it is in the interest of justice, and sentence the defendant to 50 years' imprisonment.

Thank you.

THE COURT: Okay. Mr. Bateman, Mr. Russo, can you come back up?

Mr. Bateman, you profess to be a man of God, but a man of God helps people. People look to their spiritual leaders for guidance and for help, and instead you betrayed the trust of those who followed you and became the evil that they sought protection from.

With respect to the minor girls, you took them from their homes, from their families, and made them into your sex slaves. You raped them on a regular basis. You made some of them participate in your sexual ordinances between you and other men. You made them watch as you raped the other wives. You stripped them of their innocence and their childhood.

As to the adult women, they are also victims. You raped them on a daily basis under threat of being excommunicated or on threat of damnation. You turned some of

them into felons, because they followed your directions and were fully obedient, as you demanded.  And then when the children were removed and put into someplace safe, you threatened them, you threatened their parents, and you arranged for them to be kidnapped.

The amount of harm that you caused is nothing short of unmeasurable.  The victims' letters, the two letters that I read, demonstrate that, and the victims that were brave enough to speak here today describe it.  I'll just describe a few comments from the letters.

Jane Doe 10 described how hurt she was physically, not only from the sexual abuse, but from being instructed to fast for days at a time that left her weak, tired, and hungry.  She described the mental harm, psychological harm caused by being stripped of her identity, isolated from her family so she had no place to go for support or for help.  She's left with the fear of romantic relationships and difficulty mending relationships with her family.

Naomi describes the constant fear and anxiety of living as your bride, the horror of the atonement when you forced her to have sex with Torrance Bistline -- sorry, LaDell -- and left her experiencing flashbacks that leave her shaken and emotionally overwhelmed.

She broke when she learned the truth of her situation and how she was manipulated, and she wished for death.  She

can't understand how she ended up in jail and a felon because of her obedience.

I would just mention a couple of -- or comment on a couple things.  The defendant's mental health as described by the doctor is not one that I guess influences my decision a whole lot.

You are the one that manipulated the rules of this religion.  You are the one that manipulated the others in the conspiracy.  You are the one that made yourself into a prophet, so to speak, and used that to victimize these women who, as the government points out, are now survivors.

The disparity in sentencing argument holds no water. The defendant that was referenced got 15 years, had one incident with one victim of hands-on assault.  You have multiple victims over years and have caused unimaginable harm.

You should never have the opportunity to be free, and never be given the opportunity to be around young women, never have the opportunity to be in a leadership position.

You are the worst kind of abuser.  It's not only the physical abuse, it's the mental manipulation, psychological trauma, and as I think it was Jane Doe 10 described it, stripping these women of their identity, that, as you've heard, will take years and years for them to get in a place where they can feel safe, strong, and as an individual, and have faith in other people.  I am happy to hear at some of the progress that

they've made.  It's astonishing.

I accepted the plea because it provides some finality, to not only just the case, but to the victims.  And they're survivors, so they can move forward.  And it provides an opportunity for me to give you a sentence that you deserve and that your crimes deserve.

So, pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that Samuel Rappylee Bateman is hereby committed to the Bureau of Prisons for a term of 50 years.  That consists of 50 years on Count 2 and 50 years on Count 53, all such terms to run concurrently.

Defendant shall pay a special assessment of $200 which shall be due immediately.

The defendant shall pay an additional special assessment of $5,000 pursuant to Title 18, United States Code, Section 3014(a).  Payment of the assessment shall not be payable until the defendant has satisfied all outstanding court-ordered fines, orders of restitution, and any other obligation related to victim compensation.

The defendant shall pay a fine of $2,000 due immediately or in regular monthly installments.

So you owe a total of $7,200 in criminal monetary penalties due immediately.  While incarcerated, that is due at a rate of not less than $25 per quarter, and payments shall be made through the Bureau of Prisons Inmate Financial

Responsibility Program.

The Court hereby waives the imposition of interest and penalties on any unpaid balance.

Upon release from imprisonment, sir, you will be placed on supervised release for life. This term consists of life on Count 2 and 53, all such terms to run concurrently.

While on supervised release, you must comply with the mandatory and standard conditions of supervision as adopted by this Court in General Order 17-18.

Mr. Russo, did you go over the mandatory and standard conditions of supervision with your client?

MR. RUSSO:  Yes, Your Honor.

THE COURT:  And do you waive a reading?

MR. RUSSO:  Yes, Your Honor.

THE COURT:  So, Mr. Bateman, I'm not going to reread the mandatory and standard conditions to you, but they are imposed and you have to follow them all.

And you must comply with the following special conditions:

You must submit your person, property, house, residence, vehicle, papers, or office to a search conducted by a probation officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to search pursuant to this condition.

You must participate in a mental health assessment and participate in outpatient mental health treatment as determined to be necessary by a medical or mental health professional, and follow any treatment directions by the treatment provider.

You must take medicine as prescribed by a medical professional providing mental health treatment, unless you object, in which event, you must immediately notify the probation officer.

You must contribute to the cost of treatment in an amount to be determined by the probation officer.

You must not contact the following victims:

Jane Does 1 through 11, and the probation officer will verify compliance.

You must cooperate in the collection of DNA as directed by the probation officer.

You must notify the Court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

You must attend and participate in a sex offender treatment program and sex-offense specific evaluations as approved by the probation officer.

You must abide by the policies and procedures of all treatment and evaluation providers.

You must contribute to the cost of such treatment and assessment in an amount determined to be reasonable by the

probation officer, based on ability to pay.

You must attend and participate in periodic polygraph examinations as a means to determine compliance with your terms of supervision and the requirements of your therapeutic program, as directed by the probation officer.

No violation proceeding will arise solely as the result of a polygraph test.  A valid Fifth Amendment refusal to answer a question during a polygraph examination will not be used as a basis for a violation proceeding.

You must contribute to the cost of such polygraph examination, not to exceed an amount determined to be reasonable based on ability to pay.

You must reside in a residence approved in advance by the probation officer.  If you plan to change where you live or anything about your living arrangements, such as the people you live with, you must notify the probation officer at least ten days before the change to allow the probation officer sufficient time to evaluate the proposed change.

Any changes in the residence must then be pre-approved by the probation officer.  If, however, notifying the probation officer in advance or obtaining pre-approval is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of the change or the expected change.

You must not knowingly possess, view, or otherwise use

material depicting sexually explicit conduct involving children, as defined by statute, and material depicting sexually explicit conduct involving adults, defined as explicit sexually stimulating depictions of adult sexual conduct that are deemed inappropriate by your probation officer.

This condition does not prohibit you from possessing, viewing, or using materials necessary to litigation in which you are a party, or from creating and possessing journals or writings required as part of any mandated sexual offender treatment, but you must notify the probation officer within 72 hours of possessing, viewing, or using any such materials.

You must register as a sex offender in compliance with all federal, state, tribal, or other local laws, or as ordered by the Court.  Failure to comply with registration laws may result in new criminal charges.

You must not knowingly have contact with children who you know are under the age of 18, including your own children, without the prior written permission from the probation officer.

Contact includes, but is not limited to, direct physical or verbal contact, letters, communication devices, audio or visual devices, visits, or communication through a third party.

You must not directly or indirectly contact any victim or the victim's family of the instant offenses without prior

written permission.  This also includes victims disclosed in treatment, assessment, and/or any other victim identified by the probation officer.

Indirect contact includes, but is not limited to, letters, communication devices, audio or visual devices, communication through a third party and/or your presence at any location the victim or victims may be known to frequent.  You must immediately report any contact to the probation officer.

You must not possess or use a laptop computer, desktop computer, cell phone, tablet, or any other device capable of connecting to the internet, a cellular data network, or any other public or private network or messaging system that:

One, can access materials with depictions of sexually explicit conduct involving children; two, gives you the capability to anonymously communicate with others; three, can access or download images from the internet at any location; four, can access any internet service provider, bulletin board system, chat room, or other environment which allows interaction with others; or, five, can access any other public or private network or e-mail system.

If internet access is approved by the probation officer, you must, at your own expense and as directed by the probation officer, install on all devices capable of connecting to the internet a cellular data network or any other public or private networking system, hardware or software systems to

monitor your use of those devices.

You are restricted from engaging in any occupation, business, volunteer activity, or profession where it is reasonably foreseeable that you will be alone with children under the age of 18, without prior written permission of the probation officer.

Acceptable employment shall include a verifiable work location, and the probation officer must be granted access to your worksite.

You must not go to or remain at any place where you know children under the age of 18 are likely to be, including parks, schools, playgrounds, or child care facilities.

You must not go to or remain at any place for the primary purpose of observing or contacting children under the age of 18.

Mr. Bateman, do you understand your sentence?

THE DEFENDANT:  I do.

THE COURT:  Okay.  The Court finds that this sentence is sufficient but not greater than necessary to comply with the purposes set forth in Title 18, United States Code, Section 3553(a), that it is a reasonable sentence under the statute, given the nature and circumstances of the offense, the history and characteristics of the defendant, the need to reflect the seriousness of the offense, and provide a just punishment.

The Court adopts the facts as set forth in the

presentence report in support of the guideline calculation and the reasons for the sentence.

Counsel, have I sentenced defendant in accordance with the terms of the plea agreement?

MS. SAMPSON:  Yes, Your Honor.

MR. RUSSO:  Yes, Your Honor.

THE COURT:  Mr. Bateman, I find I have sentenced you in accordance with the terms of your plea agreement, so that means you've waived your right to appeal.

I do need to advise you that if you wish to appeal, you have to do so within 14 days of today's date or you lose that right.

If you can't afford an attorney, one would be provided to you at no cost.

Does the government move to dismiss any remaining counts?

MS. SAMPSON:  Yes, Your Honor.  Pursuant to the plea agreement, the United States moves to dismiss the remaining counts against this defendant only in the Third Superseding Indictment.

THE COURT:  Okay.  On motion of the government, the remaining counts against this defendant in the Third Superseding Indictment are dismissed.

And anything else from the government?

MS. SAMPSON:  No.  Thank you, Your Honor.

THE COURT:  Anything else from the defense?

MR. RUSSO:  Thank you.  No, Your Honor.

THE COURT:  Okay.  We're at recess.  Thank you.

                    *          *          *

**R E D A C T E D   C E R T I F I C A T E**

I, CHRISTINE M. COALY, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a true and correct copy of the transcript originally filed with the clerk of court, but incorporating redactions of personal identifiers requested by the following attorney of record in accordance with Judicial Conference policy:  Ms. Elizabeth Kruschek.

Redacted characters appear as a black box in the transcript.

DATED at Phoenix, Arizona, this 8th day of May, 2025.

/s/ Christine M. Coaly_____
Christine M. Coaly, RMR, CRR

UNITED STATES DISTRICT COURT